**ASSISTED LIVING ASSOCIATES OF MOORESTOWN, L.L.C., Laurel Construction Management, Inc., and John and Jane Doe, Plaintiffs,**

v.

**MOORESTOWN TOWNSHIP, Moorestown Township Zoning Board of Adjustment, and Moorestown Township Planning Board, Defendants.**

No. Civ.A. 97–4572.

United States District Court,
D. New Jersey.

March 19, 1998.

Opinion Denying Reargument April 9, 1998.

Steven C. Rother, A. Alberto Lugo, South Orange, NJ, for plaintiffs, Assisted Living Associates of Moorestown, L.L.C., Laurel Construction Management, Inc., and John and Jane Doe.

Robert S. Greenbaum, Peter A. Buchsbaum, Robert S. Goldsmith, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, L.L.P., Woodbridge, NJ, for defendant, Moorestown Township.

Peter R. Thorndike, Ryan and Thorndike, Cherry Hill, NJ, for defendant, Moorestown Township Zoning Board of Adjustment.

Dennis P. Talty, Colin B. Scott, Dennis P. Talty, P.C., Moorestown, NJ, for defendant, Moorestown Township Planning Board.

OPINION

ORLOFSKY, District Judge.

This case requires the Court to resolve a conflict between local autonomy and federal power, specifically the conflict between a New Jersey municipality's power to zone and the federal power to eradicate discrimination against the handicapped. The developers of an innovative type of facility designed to care for the elderly and handicapped, known as "assisted living," have moved for a preliminary injunction under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, demanding a reasonable accommodation to allow the construction of an assisted living facility which they have proposed for the Township of Moorestown, New Jersey.

Plaintiffs' proposed land-use had been permissible under Moorestown's zoning law until the very moment when Plaintiffs had cleared other regulatory hurdles necessary to go forward with their project. At that point, in what can best be described as a "Catch–22," Moorestown passed a zoning ordinance which effectively "spot-zoned" Plaintiffs' proposed land use out of one chosen area of Moorestown and imposed special requirements on Plaintiffs. The timing of the passage of the ordinance, considered in combination with the minutes of subsequent Planning Board meetings, clearly reflect an intention to relegate the handicapped to the periphery of residential areas or "transitional" parts of Moorestown. In light of Plaintiffs' substantial, but ultimately unsuccessful efforts to locate alternative sites which might meet with Moorestown's approval, the reactions by the Township and the Planning Board to Plaintiffs' proposed project compel the conclusion that the Plaintiffs are likely to succeed in showing that the accommodation requested is necessary for the enjoyment of equal housing opportunities. Plaintiffs are also likely to succeed in showing that the requested accommodation is reasonable, particularly since the Township has clearly accommodated other developers when it was in the Township's financial and legal interest to do so. The Court will therefore grant the Plaintiffs' motion for a preliminary injunction and, accordingly, deny the motions of the Township, the Township's Zoning Board, and the Township's Planning Board to dismiss Plaintiffs' complaint and/or for summary judgment.

After careful review of the evidence presented by the parties during two days of hearings conducted on December 11 and 17, 1997, the affidavits, certifications, exhibits, briefs, and letters submitted by the parties,

and the applicable law, I make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Findings of Fact

### A. The Parties and their Agents

1. Plaintiff, Assisted Living Associates of Moorestown, L.L.C. ("ALA"), is a limited liability company formed pursuant to the laws of Delaware and authorized to do business in New Jersey. Verified Complaint ¶ 5 (dated Sept. 4, 1997) (hereinafter Compl.).

2. Plaintiff, Laurel Construction Management, Inc. ("LCM"), is a New Jersey corporation, and is associated with ALA. *Id.* at ¶¶ 6, 10.

3. Plaintiffs, John and Jane Doe (the "Doe Plaintiffs"), are prospective residents at a facility to be constructed and managed by LCM and ALA. *Id.* at ¶¶ 7, 14.

4. Thomas H. Parkinson ("Parkinson") is the principal partner in ALA and the vice president of LCM. Certification of Thomas H. Parkinson ¶ 1 (dated Dec. 3, 1997) (hereinafter Parkinson 12/3/97 Certif.); Supplemental Certification of Thomas H. Parkinson ¶ 1 (dated Dec. 1, 1997) (hereinafter Parkinson 12/1/97 Certif.); Transcript 7–8 (dated Dec. 11 & 17, 1997) (hereinafter Trans.).

5. Defendant, Moorestown Township ("Moorestown" or the "Township"), is a municipal corporation with the power to zone pursuant to New Jersey's Municipal Land Use Law, N.J.S.A. 40:55D–1 *et seq.* Compl. at ¶ 8; Answer of Defendant, Moorestown Township ¶ 8 (dated Nov. 21, 1997). The Township is located in Burlington County.

6. Moorestown has a population of approximately 16,000 people, of which approximately 17% are over the age of 65. *See* Certification of John J. Lynch, Exh. A at 2–3 (dated Nov. 20, 1997) (hereinafter Lynch Certif.). In 1970, approximately 11.5% of the population of Moorestown was over the age of 65. *Id.*

7. Defendant, Moorestown Township Zoning Board of Adjustment (the "Zoning Board"), is a municipal body created pursuant to N.J.S.A. 40:55D–69, with the powers set forth in N.J.S.A. 40:55D–70 *et seq.* *See, e.g.,* Answer of Defendant, Moorestown Township Zoning Board of Adjustment ¶ 9 (dated Nov. 21, 1997).

8. Defendant, Moorestown Township Planning Board (the "Planning Board"), is a municipal body created pursuant to N.J.S.A. 40:55D–23 *et seq.,* with the powers set forth in N.J.S.A. 40:55D–25 *et seq.* *See, e.g.,* Answer of Defendant, Moorestown Township Planning Board ¶ 9 (dated Nov. 20, 1997).

9. Harry W. McVey ("McVey") is the Director of Community Development for the Township, Secretary to the Planning Board, and the Zoning Officer of the Township. Trans. at 150; Certification of Harry W. McVey ¶ 1 (dated Nov. 17, 1997) (hereinafter McVey Certif.). McVey exercises substantial influence in the planning and zoning of the Township. *See, e.g.,* Trans. at 251, 273–74.

### B. The Nature of Assisted Living and Assisted Living in Moorestown

10. On May 3, 1996, pursuant to N.J.S.A. 26:2H–1 *et seq.,* the New Jersey Department of Health issued to LCM a certificate of need for the construction of an assisted living facility in Mount Laurel, Burlington County, New Jersey. 3 *See* Plaintiffs' Exh. 1 at 1; Trans. at 407.

11. The certificate of need authorizes LCM to construct an assisted living facility anywhere in Burlington County. *See* Trans. at 8, 59. In order to provide assisted living services, a facility must, in addition to a certificate of need, be licensed to provide those services. *See, e.g.,* Trans. at 392, 400–01; N.J.A.C. 8:36–2.2; *see also* Plaintiffs' Exh. 9.

12. Assisted living is a relatively recent development in the provision of long-term care services to the elderly and handicapped. Essentially, the concept allows a facility to provide a range of services wider than those which may be provided by, for example, a nursing home. The fact that the facility is more flexible in the types of services which it offers allows a resident to age "in place" without constantly moving from facility to facility as a resident's condition evolves. Also, since an assisted living resident may

not need as much care as, for example, a patient in a nursing home, an assisted living facility is designed to ensure that a resident maintains as much independence, autonomy, individuality, privacy, and dignity as possible. The most obvious and important way a resident achieves these goals is by living in an independent, apartment-like unit with a private bathroom and kitchenette, rather than in a hospital-like room. Because the services provided are more particularly tailored to an individual's needs, the quality of life is better than for patients in a nursing home. *See generally* Trans. at 393–403; N.J.A.C. 8:36–1.3 (noting that "assisted living promotes resident self direction and participation in decisions that emphasize independence, individuality, privacy, dignity, and homelike surroundings").

13. An assisted living facility may provide services which resemble the services someone might otherwise receive in a nursing home. *See* N.J.A.C. 8:36–4.1(b), (d); Trans. at 19, 396, 399.

14. A typical resident of an assisted living facility needs assistance with two or more basic daily activities, such as, toileting, bathing, or dressing, and is, on average, approximately 85 years old. *See* Trans. at 101, 397, 399–400; *see generally* N.J.A.C. 8:36–4.1(a–d).

15. There are no assisted living facilities currently operating in Moorestown. *See, e.g.,* Plaintiffs' Exh. 32.

16. In approximately August, 1997, the Zoning Board approved the application of Brandywine Senior Care, Inc. ("Brandywine") for the eventual construction of an assisted living facility with a capacity of approximately 100 residents on a site located at the intersection of Church Street and New Albany Road in Moorestown. *See* Defendants' Exh. 7–8; Trans. at 106, 197–98, 272, 278.

### C. ALA before the Planning and Zoning Boards

17. Sometime in mid–1996, LCM purchased a 14.75–acre parcel of land, Block 7100, Lot 1 ("Lot 1"), located approximately at the intersection, and immediately to the south and east, respectively, of Garwood Road and Westfield Road in Moorestown for approximately $435,000. Plaintiffs' Exh. 3–4.

18. Approximately 11.2 acres of Lot 1 are encumbered by a conservation easement granted in favor of the Township which prohibits, *inter alia,* various actions which are inconsistent with agricultural and equestrian uses. *See* Plaintiffs' Exh. 3; McVey Certif. at ¶ 12 & Exh. E. The remaining approximately 3.55 acres of Lot 1 are encumbered by a covenant running with the land which states that the land "shall not be further subdivided *EXCEPT* that a two lot residential subdivision shall be permitted, subject to subdivision approval by the" Township. *Id.* at Exh. F (emphasis in original); Trans at 67–68.

19. On or about September 17, 1996, ALA submitted an application to the Planning Board for a conditional use and site plan approval for the construction of an assisted living facility on the portion of Lot I which was not encumbered by the conservation easement, *i.e.,* the 3.55 acre portion. *See, e.g.,* Plaintiffs' Exh. 7; McVey Certif., Exh. C; Trans. at 24–25, 66.

20. At the time of the application, Township ordinances allowed in the R–1 zone as conditional uses, *inter alia,* a "nursing home or similar health facility; a home for ... the aged, the handicapped or similar institutional use under the sponsorship of a religious or nonprofit community service organization; ... or a continuing care facility for the elderly," if such uses complied with section 180–91 of the Moorestown Code. Moorestown Code § 180–8.D(3).

21. A conditional use is a use which may be allowed upon the fulfillment of certain conditions, the satisfaction of which is determined by the Planning Board applying definite specifications and standards. *See, e.g.,* N.J.S.A. 40:55D–24, 40:55D–67; Moorestown Code § 180–107 (enunciating standards formerly applied by the Planning Board); Trans. at 304–09, 350.

22. The R–1 zone consists of one and one-half acre lots and generally comprises most of the eastern, more rural, relatively less densely developed part of Moorestown, that

is, the areas east of Westfield Road. *See* Trans. at 151–52, 161; Plaintiffs' Exh. 4; *see generally* Plaintiffs' Exh. 36 at 9, 16 (noting that "intent of 1989 Master [Plan] was to preserve rural character in the eastern portion of the Township" and noting that "growth in residential district in the eastern portion of the Township raises the question of whether small scale retail and personal service uses should be established in reasonable proximity to new neighborhoods").

23. Section 180–91 requires, *inter alia,* that certain institutions, including an "assisted care or nursing home ... a continuing-care facility of the senior citizen; home for the aged, indigent or the handicapped" meet a minimum acreage requirement of five acres. Moorestown Code § 180–91(B); Plaintiffs' Exh. 35.

24. On October 28, 1997, McVey informed a representative of LCM that the application did not meet the minimum acreage requirement of section 180–91 because, in the opinion of the Planning Board's attorney, the 11.2 acres of Lot 1 restricted by the conservation easement could not be utilized to meet the minimum acreage requirement. The letter further informed LCM that it could apply to the Zoning Board for a use variance and site approval. *See* Plaintiffs' Exh. 10; Trans. at 24–25; *see generally* N.J.S.A. 40:55D–70(c) (outlining general power of zoning boards of adjustment to grant variances from zoning ordinances); N.J.S.A. 40:55D–76 (providing for concurrent jurisdiction by zoning boards of adjustment to grant site approvals where applicants have also requested use variances).

25. Pursuant to N.J.S.A. 40:55D–70, an applicant, following a determination by the Planning Board, could either apply to the Zoning Board for a use variance, appeal the Planning Board's decision with respect to the minimum acreage requirement to the Zoning Board, or request from the Zoning Board an interpretation with respect to the minimum acreage requirement. *See* N.J.S.A. 40:55D–70(a)–(c). Advised by McVey of some or all of these options, ALA on or about November 4, 1997, opted to appear before the Zoning Board for an interpretation. Trans at 70–73, 259–60.

26. On or about November 4, 1997, ALA applied for an interpretation as to whether it could utilize part of the 11.2–acre portion of Lot 1 to meet the minimum acreage requirement. Trans. at 26; Compl. at ¶ 17.

27. While the application for an interpretation was pending, LCM contracted to purchase for $260,000 Block 7100, Lot 2 ("Lot 2"), a 2.05–acre plot contiguous with Lot 1 and also zoned R–1. *See* Trans at 26; Plaintiffs' Exh. 5–7. Lots 1 and 2 are not within the current or proposed sanitary sewer service areas of Moorestown. *See* Plaintiffs' Exh. 19–20; Trans. at 259. ALA continues to pay $2,000 per month in order to maintain the option to purchase Lot 2. *Id.* at 13; *see also* Plaintiffs' Exh. 4.

28. On December 17, 1997, the Zoning Board heard and decided ALA's application for an interpretation, and confirmed that, in its view, no portion of the 11.2–acre parcel could be used to satisfy the minimum acreage requirement of section 180–91. *See* McVey Certif., Exh. H.

29. After the affirmance of the Planning Board's interpretation of the minimum acreage requirement, on or about December 26, 1997, ALA submitted a new site plan and application to the Planning Board proposing to use, in combination, the 3.55 acres of Lot I not encumbered by the conservation easement and the additional 2.05 acres of Lot 2 to meet the minimum acreage requirement of section 180–91. ALA did not propose to use the 11.2 acres encumbered by the equestrian and agricultural easement or to "further subdivide" Lot 1. Trans. at 27; Plaintiffs' Exh. 7, 11; Certification of Thomas H. Parkinson at ¶¶ 12–13 (dated Sept. 16, 1997) (hereinafter Parkinson 9/16/97 Certif.).

30. On or about January 8, 1997, ALA filed an action in lieu of prerogative writs in the Superior Court of New Jersey, Burlington County, Law Division, against the Township and the Zoning Board claiming that the Township and Zoning Board's interpretation of section 180–91 with respect to the use of deed-restricted lands, specifically, the 11.2–acre part of Lot 1, to satisfy the minimum acreage requirement, was arbitrary and capricious, and not in compliance with

existing law. *See Assisted Living Assoc. of Moorestown, L.L.C. v. Moorestown Township, et al.,* Docket No. BUR–L–00046–97, Complaint in Lieu of Prerogative Writ[s] ¶ 14 (dated Jan, 7, 1997); *see generally* N.J.R.Ct. 4:69; Sylvia B. Pressler, *Rules Governing the Court of the State of New Jersey* 1430–35 (1997) (discussing use of complaint in lieu of prerogative writs to challenge municipal and municipal agency action).[1]

31. On or about January 29, 1997, and after initial consideration by the Township on January 15, 1997, the Township adopted Ordinance No. 1806–97. *See* Plaintiffs' Exh. 13; Certification of John T. Terry, Exh. A (dated Nov. 18, 1997); McVey Certif., Exh. I. Section 1 of Ordinance No. 1806–97 added to the special requirements of section 180–91 that institutions "be located within an existing sanitary sewer service area, as shown in the Township's approved Wastewater Management Plan [and that such institutions] shall connect to the Township sanitary sewer system." *Id.* at § 1. By amendment to Moorestown Code § 180–8(D), section 2 of Ordinance No. 1806–97 also removes as conditional uses in the R–1 zone "a hospital, sanatorium, nursing home or similar health facility; a home for ... the aged, the handicapped or similar institutional use under the sponsorship of a religious or nonprofit community service organization; ... [and] a continuing care facility for the elderly." *Id.* at § 2.

32. Section 3 of Ordinance No. 1806–97 also adds as conditional uses in the R–2 zone "a hospital, sanatorium, nursing home or similar health facility; a home for ... the aged, the handicapped or similar institutional use under the sponsorship of a religious or nonprofit community service organization; ... [and] a continuing care facility for the elderly" if such uses complied with section 180–91 of the Moorestown Code. *Id.* at § 3.

33. After passage of Ordinance No. 1806–97, the following uses were among those either permitted or conditionally allowable in the R–1 zone: agricultural uses, single family homes, public and private schools, a church or similar house of worship, a club or lodge, a kennel, and a cemetery. *See* Moorestown Code § 180–8.

34. The R–2 zone consists of 20,000 square-foot lots and generally rings the town center area. Trans. at 152; *see generally* Defendants' Exh. 4.

35. The effective date of Ordinance No. 1806–97 is February 18, 1997. *See, e.g.,* Plaintiffs' Exh. 12; McVey Certif., Exh. I.

36. There is no disagreement that Ordinance No. 1806–97 is applicable to ALA's application by operation of New Jersey's "time of decision" rule which generally mandates that the statutes in effect at the time of a decision apply to a specific application, including an application pending before the amendment of a statute. *Id.;* Trans. at 270–71; *see generally Manalapan Realty, L.P. v. Township Comm. of Manalapan,* 140 N.J. 366, 378–79, 658 A.2d 1230 (1995); *Pizzo Mantin Group v. Township of Randolph,* 137 N.J. 216, 235–36, 645 A.2d 89 (1994); *Kruvant v. Mayor & Council of Township of Cedar Grove,* 82 N.J. 435, 441–42, 414 A.2d 9 (1980); Carl S. Bisgaier & Yvonne Marcuse, *Vesting and the Time of Decision Rule,* New Jersey Lawyer, Nov./Dec.1997, at 13.

37. It was ALA's application to the Planning Board for conditional use and site approval which caused McVey to review the language of sections 180–8(D) and 180–91 of Moorestown's Code, and to recommend to the Planning Board that they be amended and that Ordinance No. 1806–97 be passed. *See* Trans. at 260–64; *see generally* N.J.S.A. 40:55D–26 (providing generally for role of planning boards role in passage of zoning amendments); N.J.S.A. 40:55D–32 (providing

1. Under New Jersey law, factual findings and the exercise of discretionary judgment by municipalities or municipal agencies are reviewed by the New Jersey Superior Court to determine whether they are arbitrary, capricious, or unreasonable, that is, whether they are supported by "sufficient credible evidence." However, where the issue is the reading of an ordinance and its application to an undisputed state of facts, the standard of review is *de novo. See Cherney v. Matawan Borough Zoning Bd. of Adjustment,* 221 N.J.Super. 141, 144–45, 534 A.2d 41 (App.Div.1987); *Grancagnola v. Planning Board of the Township of Verona,* 221 N.J.Super. 71, 75–76, 533 A.2d 982 (App.Div.1987).

generally for referral by planning boards of proposed amendments to official zoning maps).

38. Although it is not contested that prompt review of ordinances as a result of pending applications is not unusual, another section of the Township's Code, Moorestown Code § 180–107, which sets forth the standards which the Zoning or Planning Boards are to apply in exercising their discretion with respect to conditional uses, was not amended in the time since before December, 1995, when those standards were held to be unenforceable. *See* Trans. at 261–62, 306–310; Plaintiffs' Exh. 34, 36 at 18 (noting in approximately December, 1995, that "recent litigation has resulted in the need to rewrite the Township's conditional use standards" and that such standards "are being developed").

39. Section 1 and section 2 of Ordinance No. 1806–97 negatively affected ALA's proposed plans because Lots 1 and 2, the Garwood–Westfield Roads site selected by ALA, were not in a sanitary sewer service area and because the proposed use was no longer even conditionally allowable in the R–1 zone. Thus, ALA's application could no longer be considered by the Planning Board. Rather, ALA would have to apply to the Zoning Board for a variance. Eventually, by letter, McVey informed ALA of the effect of Ordinance No. 1806–97. *See* Trans. at 29–30; Plaintiffs' Exh. 11–12.

40. Had ALA applied to the Zoning Board for a variance from section 180–91 requiring institutions to be in a sewer service area, it is "extremely unlikely" that the variance would have been granted. McVey testified without contradiction that he would oppose such a variance and would not have recommended that such a variance be granted. Accordingly, ALA's application for such a variance would have been futile. *See* Trans. at 255–59, 263.

**D. ALA's Consideration of Alternative Sites and Board Reactions**

41. ALA has made substantial efforts to evaluate, prepare site plans, and/or negotiate for the purchase of at least four other properties with an eye toward constructing its facility on them. Some of these were referred to Parkinson by McVey. *See, e.g.,* Trans. at 33, 76.

42. ALA evaluated a potential site located at New Albany Road and Church Street (the "Fisher property") and considered it inappropriate for an assisted living facility because of its proximity to an industrial district. *See, e.g.,* Trans. at 34, 106, 117; Parkinson 12/1/97 Certif. at ¶ 11; *see also* ¶ 16, *supra.*

43. In late January, 1997, ALA was negotiating with Fred DiMarco for the purchase of a piece of a property approximately 23 acres in size located near the intersection of Main Street and Marter Road in Moorestown (the "DiMarco property"). The property is located in part in the R–2 zone and in part in the SRC–1 (specially restricted commercial) zone, and is within the sewer service area. *See* Affidavit of Fred DiMarco ¶¶ 3–4 (dated Nov. 19, 1997) (hereinafter DiMarco Aff.); *see also* Plaintiffs' Exh. 15, 19; Defendants' Exh. 4; Trans. at 34.

44. On February 6, 1997, the Planning Board met to review informally ALA's proposal for its assisted living facility on the DiMarco property, which involved an assisted living facility, as well as townhouses and single family homes. Trans. at 35, 332, 339–40. At that meeting, the Board was also considering "the draft ordinance on assisted care facilities." Plaintiffs' Exh. 16 at 2.[2] McVey "said [that] the real purpose of the ordinance is to clarify that the minimum five acres is required for institutional use and that no part of that five acres can be deed restricted against any development." *Id.*

2. Plaintiffs' Exh. 16 and 17 are minutes, but not transcripts, of two Planning Board meetings. The minutes are prepared either from non-stenographic notes taken at the meetings or from tape-recordings of the meetings from which notes are taken after, depending on the type of meeting. At a subsequent meeting, the minutes are adopted by the Planning Board as accurate reflections of the previous proceedings. *See* Trans. at 137–39, 143, 326–30. The accuracy of the minutes has not been disputed by Defendants, nor has the accuracy of handwritten notes taken at the February 27, 1997, meeting by a representative of ALA and a reproduction thereof, Plaintiffs' Exh. 23–24. *See, e.g., id.* at 37, 136, 145–48, 341, 348.

This ordinance, Ordinance No. 1814–97, was eventually passed by the Township. *See* Plaintiffs' Exh. 14.

45. Before the arrival of representatives of ALA at the February 6, 1997, meeting, McVey noted that "these types of facilities are not necessarily good neighbors in the neighborhoods in which they are located despite an ordinance which allows them." Plaintiffs' Exh. 16 at 3. In discussing assisted living facilities in Moorestown, another member of the Board, Salvatore Alessi, stated that "you do not want to get into a mind set that 'it is going to happen—so let's facilitate.' ... he cautioned against this kind of thinking that would lead to an approval because we believe it's inevitable." *Id.*

46. During the meeting with representatives of ALA, noting again that assisted living facilities "often ... do not make the neighbors happy," McVey stated that the DiMarco property might be suitable for an assisted living facility "since it's on the edge of an established neighborhood." *Id.* at 7.

47. Construction on the DiMarco property would have required rezoning the part of the DiMarco property, which was zoned SRC–1, or a variance. *Id.* at 13; Trans. at 35; DiMarco Aff., Exh. B; Plaintiffs' Exh. 17 at 10.

48. During February and March, 1997, ALA also entertained negotiations with John B. Ravikio for the purchase of a 7–acre site (the "Ravikio property") which is located on the western side of Westfield Road, is within the sewer service area, and is zoned R–2. *See* Trans. at 38–42; Affidavit of John B. Ravikio (dated Nov. 13, 1997); Defendants' Exh. 4; Plaintiffs' Exh. 15, 20.

49. During a February 27, 1997, meeting of the Planning Board, a continuation of the informal dialogue between the Board and ALA regarding the DiMarco property, *see* Trans. at 343, McVey reported that ALA was considering purchasing the Ravikio property. Plaintiffs' Exh. 17 at 10. "Several Board members expressed open surprise and dismay at [the] information" that Ravikio might be willing to discuss selling the property to ALA. *Id.* Earlier, Alessi had indicated that:

> [w]e may be getting into a situation where we have an over use in this particular sector.... He ... wonder[ed] if Moorestown doesn't have its "fair share" of this type of use. He thinks the various applications are coming too quickly with too much emphasis on rushing them through. He also thinks that retirement communities can skew the politics of a community ... He does not wish to see school funding suffer as a result of a preponderance of persons who have no interest in protecting school funding.

*Id.* at 6. Alessi agreed that assisted living complements other types of care of the elderly and handicapped available in Moorestown, but "he still felt all these applications represented an overuse." *Id.* at 6–7; *see also* Trans. at 344–45. McVey later noted in response that "you can quickly reach a saturation point." Plaintiffs' Exh. 17 at 7.

50. Alessi "argued for not setting a precedent. The fear is that approval of one will lead to approval of too many." *Id.* at 8. Another Board member, Harry Koons, responded "that a precedent was set when we approved a fast food restaurant in this town. There was a cure for the spread of fast food places and there will be a cure for the proliferation of assisted living facilities." *Id.; see also* Trans. at 347.

51. Regarding the placement of facilities for the elderly and handicapped, the minutes note that "McVey also reminded the Board that we already allow this in residential zones as a conditional use. Residents do not, however, like to have these facilities in the middle of a neighborhood. This is part of the reason why [another application] failed. He believes that [another applicant] was successful in its expansion because it is on the periphery of the town. It's not a new concept, but do we actually prefer to see it set apart from the center of town?" Plaintiffs Exh. 17 at 8; *see generally* Plaintiffs' Exh. 23–24; Trans. at 279–83, 363.

52. Another Board member, Michael Nichols, said that "he didn't want to be forced to change zoning because you have *this* building *here.*" Plaintiffs' Exh. 17 at 8 (emphasis in original).

53. Another Board member, Andrew Shapiro, stated "that he feels like he is being strong-armed. He thought the process should be slowed way down and if the applicant pushes, make them go to the Zoning Board." *Id.* at 8.

54. Another Board member, Milton McFalls, "complained that Moorestown always seemed to have to be the first with new concepts and hard choices. He wished that the Board had the ability or luxury of stepping back and watching someone else do it first." *Id.* at 9.

55. Thomas Keyes, a Board member, "pointed out that you cannot just tell these applicants 'no' without a justification. What's our justification? [He] also commented that these discussions overlooked the need factor." Nichols, however, "disagreed with that assessment." *Id.*

56. Counsel for the Planning Board said that "[i]f Assisted Living comes in with the ... Ravikio application, that would be the hardest scenario to control. He too could find no easy way to deny such an application." *Id.* at 10.

**E. ALA's Wilson Application and Further Changes in Moorestown's Zoning Scheme**

57. In late-February 1997, the Township answered ALA's Complaint in Lieu of Prerogative Writs and asserted by way of counterclaim that ALA's proposed use would violate the conservation easement encumbering part of Lot 1. *See ALA of Moorestown, L.L.C. v. Moorestown Township, et al.*, BUR–L–00046–97, Answer and Counterclaim at p. 4–5 (dated Feb. 25, 1997); *see also* ¶ 18, *supra.*

58. In March 1997, the Township passed Ordinance No. 1813–97 which added assisted living facilities as a conditional use in the CIO (commercial-institutional/office), CRO (commercial-retail/office), and CHS (commercial highway services) zones. McVey Certif. at ¶ 26. After the passage of this Ordinance, assisted living was a permitted or conditional use in ten of Moorestown's zoning districts, the R1–A, R–2, R–3, R–3TH, RSC (residence-senior citizen), RLC (residence-limited commercial), and the three districts added by the Ordinance. *Id.* at ¶ 25; *see also* Trans. at 250; Defendants' Exh. 4.

59. On March 11, 1997, ALA amended its Complaint then pending in the New Jersey Superior Court against the Township and the Zoning Board to allege a cause of action under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq. See ALA of Moorestown, L.L.C. v. Moorestown Township, et al.*, BUR–L–00046–97, Answer to Counterclaim and Amended Complaint (dated March 11, 1997).

60. After having considered and/or proposed using Lot 1, Lots 1 and 2 combined, the Fisher property, the Ravikio property, and the DiMarco property, sometime in approximately April, 1997, ALA became interested in a sixth potential site on which to build its facility in Moorestown, the "Wilson property." *See, e.g.*, Parkinson Certif. 9/16/97; McVey Certif., Exh. M. The Wilson property was always considered a "fail-safe" option by ALA. Trans. at 44, 115, 123.

61. The Wilson property, zoned R–2, is located approximately at the intersection of Linden Street and Allen's Lane, an unpaved dirt road. *See* Trans. at 42; Defendants' Exh. 4. The success of any development of an assisted living facility on the Wilson property would depend, to some extent, on the approval and development of a housing complex, the "Wexford development," on nearby property because the Wexford development would bring a paved road, and sewer and water service to that area of Moorestown. Trans. at 42–45, 83, 86, 89, 295–96.

62. In approximately November, 1997, the Wexford development received the necessary approvals from the Planning and/or Zoning Boards. *See* Trans. at 197. Construction of the Wexford development has not proceeded because, as of yet, the Lockheed Martin Corporation, the party which received the necessary approvals, has not yet found a purchaser for the land and development opportunity. *See id.* at 366. Construction of the development is not expected to begin until the middle or Summer of 1998. *Id.* at 197, 295–96, 365–66.

63. On December 1, 1997, ALA withdrew its application for site plan approval for the Wilson property citing, among other reasons, restricted access, development costs, and nearby arsenic and water pollution which ALA learned about after its initial application, *see* Trans. at 115, and had caused to be investigated by environmental engineering consultants. *See* Plaintiffs' Exh. 21; Defendants' Exh. 9; Trans. at 45–47, 84, 115, 117–123; *see also id.* at 195–96 (discussing arsenic and water pollution). ALA has no applications currently pending before the Zoning or Planning Boards.

**F. Continuing Litigation over ALA's Application**

64. In addition to the action pending in the New Jersey Superior Court, on September 4, 1997, ALA along with LCM and the Doe Plaintiffs, both of whom were not parties to the state court action, filed a Verified Complaint in this Court naming as Defendants, the Township and the Zoning Board, which had both been named in the state court action, as well as the Planning Board, which had not. *See* Compl. at ¶¶ 7–9.

65. The Complaint alleges that Ordinance No. 1806–97 violates the Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601 *et seq.*, that Defendants have intentionally discriminated against the handicapped and "interfere[d] with persons having aided or encouraged other persons in the exercise or enjoyment of rights" protected by the FHA, and that Defendants have failed to make a reasonable accommodation to the handicapped. Compl. at ¶¶ 24–31. Plaintiffs also allege violations of the Equal Protection and Due Process clauses of the United States and New Jersey Constitutions. *See id.* at ¶¶ 32–34; *see also* U.S. Const. amend. V, XIV; N.J. Const. art. 1, ¶ 1; *Southern Burl. Cty. N.A.A.C.P. v. Township of Mount Laurel,* 67 N.J. 151, 174–75, 336 A.2d 713 (noting that guarantees of substantive due process and equal protection, though not expressed in those terms, have nevertheless been deemed inherent in Article 1, paragraph 1 of New Jersey Constitution), *cert. denied,* 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975). Finally, Plaintiffs allege that Defendants improperly restrict the use of private property in violation of the New Jersey Constitution and the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D–1 *et seq.* *See* Compl. at ¶¶ 35–37.[3]

66. On October 10, 1997, after a hearing, the Honorable Ronald E. Bookbinder, Judge of the Superior Court, dismissed without prejudice ALA's Amended Complaint in Lieu of Prerogative Writs then pending in the Superior Court. *See* Certification of Steven C. Rother, Esq. ¶ 3, Exh. I at 20, Exh. II (dated Nov. 28, 1997) (hereinafter Rother 11/28/97 Certif.); Letter from Peter R. Thorndike, Esq. Exh. 1 (dated Dec. 5, 1997); Trans. at 208, 419–20.

67. On November 21, 1997, Plaintiffs moved for a preliminary injunction in this Court and, several weeks later, on December 11 and 17, 1997, the Court conducted two days of hearings.

68. On December 16, 1997, Judge Bookbinder entered final judgment against ALA on the Township's counterclaim, *see* ¶ 57, *supra,* and enjoined ALA from violating the conservation easement, subject to the Township and Zoning Board's right to file a motion for reconsideration. *ALA of Moorestown, L.L.C. v. Moorestown Township, et al.,* BUR–L–00046–97, Order (dated Dec. 16, 1997); *see also ALA of Moorestown, L.L.C. v. Moorestown Township, et al.,* BUR–L–00046–97, Order (dated Dec. 19, 1997) (dismissing ALA's claims without prejudice subject to the condition that any subsequent prerogative writs action would be untimely).

69. On January 7, 1997, Judge Bookbinder entered an Amended Judgment on the Township's counterclaim, granting final judgment against ALA and enjoining ALA from using the 11.2–acre part of Lot 1 to satisfy the 5–acre bulk requirement. *See ALA of Moorestown, L.L.C. v. Moorestown Township, et al.,* BUR–L–00046–97, Amended Judgment on Counterclaim (dated Jan. 7,

3. The Complaint did not allege causes of action under the sections of the Americans with Disabilities Act ("ADA") or the Rehabilitation Act which apply to public entities. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *see generally Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir.1997) (holding that ADA and Rehabilitation Act applied to city zoning decisions).

1998). There currently is no litigation pending in state court.

### G. Sewer Service and Development in Moorestown

70. Within Moorestown, in general there are two areas east of Westfield Road which are, or are proposed to be, served by public sewers. *See, e.g.,* Plaintiffs' Exh. 19–20.

71. The Laurel Creek development consists or will consist of approximately 470 units clustered around a golf course, and possibly some substantial amount of office space. It is or will be, by agreement, serviced entirely by the Mount Holly Sewerage Authority, not by Moorestown's sewer system. *See* Plaintiffs' Exh. 19–20; Defendants' Exh. 1 at 2, 2A, 17–19; Trans. at 90, 160–61, 163–64, 357.

72. The Moorestown Hunt development, which consists or will consist of approximately 250 homes on lots ranging from 12,000 to 13,000 square-feet, is or will be serviced entirely by Moorestown's sewer system. *See, e.g.,* Trans. at 50–51; Plaintiffs' Exh. 19–20.

73. The development of, and provision of public sewer service to, the Laurel Creek and the Moorestown Hunt developments are considered by the Township's zoning authorities to be "aberrations" to the Township's plan for development. *See* Trans. at 158, 161.

74. The sewering of the Laurel Creek and Moorestown Hunt developments was permitted by the Township only as a means to satisfy Moorestown's obligations to provide a certain amount of low- and moderate-income housing. Trans. at 158–161. Basically, in exchange for a monetary contribution, which the Township would use to build low- and moderate-income housing in other locations of the Township, the Township approved the Moorestown Hunt development and agreed to work with the developers to provide public sewer access to the Moorestown Hunt development. *See* Trans. at 91, 158–161, 319–320.

75. The arrangement with respect to the Laurel Creek development is similar: in exchange for a monetary contribution which would allow the Township to satisfy its obligations to provide for low- and moderate-income housing, certain changes to Moorestown's zoning requirements, specifically changes with respect to density requirements and changes with respect to proposed sewer service areas, were effected. *See id.* at 158–161, 319–20, 337–38; Defendants' Exh. 1 at 17–19.[4] The agreement with the Mount Holly Sewerage Authority, *see* ¶ 71, *supra,* was a result of this arrangement.

76. The contributions to the Township for low- and moderate-income housing by developers and/or builders as a result of the arrangements with respect to Moorestown Hunt and Laurel Creek total approximately $5.6 million. *Id.* at 160.

77. In order to provide sewer service to Lots 1 and 2, ALA has proposed either to connect at its own expense to the Township's existing sewer system by installing a 4– or 6–inch gravity line into the sewer connection at the middle of Westfield Road, or to construct an on-site septic system. *See* Trans. at 55–56, 93, 115–16, 126–28; *see also* Plaintiffs' Exh. 22 *passim* & n. 21. McVey testified that permanent septic systems are not appropriate for facilities of the size of the proposed assisted living facility because of certain unspecified "problems down the road" with such a system. Such a system is, however, technically feasible. *Id.* at 259.

78. Moorestown's wastewater management plan, with the exception of the two "aberrations" referred to above, *see* ¶ 73, *supra,* provides for sewer service to the west of Westfield Road and septic systems to the east of Westfield Road. *See id.* at 155–57.

79. Allowing sewer service for Lots 1 and 2 would be inconsistent with the wastewater management plan "without coming up with compelling reasons, both in terms of [the Township's] treatment plant capacity as well as [in terms of] other property owners" who have been rejected when they requested sewer service. *See id.* at 163, 259.

4. For a discussion of these sorts of arrangements and the potential problems they may cause, see generally *Nunziato v. Planning Bd. of Edgewater,* 225 N.J.Super. 124, 128–34, 541 A.2d 1105 (App. Div.1988).

80. In order to amend Moorestown's wastewater management plan, various municipal authorities, including the Township, and state regulatory authorities must approve the amendment of the plan. Trans. at 162–63; *see also id.* at 93–94 (noting generally that the State authorities agree to changes to the wastewater management plan if the Township supports such changes).

**H. Existing and Approved Facilities for the Elderly and Handicapped in Moorestown**

81. There are currently four operating facilities in Moorestown which provide various forms of long-term care for the elderly. *See, e.g.,* McVey Certif. at ¶ 34.

82. The Lutheran Home provides licensed nursing care for approximately 191 residents, residential healthcare for 79 residents, and provides 13 residents with an independent living environment. Trans. at 132, 232–233, 236–37; Defendants' Exh. 3.D.1 to 3.D.7.

83. The Greenleaf Extension is a 34–bed skilled nursing facility and also provides a 21–bed boarding house and 7 apartments. It is not a licensed assisted living facility. *See* Certification of David G. Kostinas ¶ 4 (hereinafter Kostinas Certif.); Trans. at 238; Plaintiffs' Exh. 32; Defendants' Exh. 3.E.1 to 3.E.8. The Greenleaf Extension intends to discontinue the provision of skilled nursing care at this facility, to relocate these residents elsewhere, and to convert the nursing facilities into additional boarding units. *See* Kostinas Certif. at ¶¶ 4–5; Trans. at 238. It will be difficult to relocate the patients currently residing at the Greenleaf Extension to a nursing home or assisted living facility in Moorestown because two other potential locations are at or near full capacity. *See* Kostinas Certif. at ¶ 5.

84. The Evergreens is a licensed nursing home which also provides other levels of continuing care for approximately 400 total elderly residents. The Evergreens is not a licensed assisted living facility. *See* Trans. at 132, 241–42; Plaintiffs' Exh. 32. *But see* Trans. at 272.

85. The Moorestown Ecumenical Neighborhood Development, M.E.N.D., Inc., operates several different types of senior care facilities, none of which is a licensed assisted living facility. Among those are Teaberry Run, consisting of 24 units, the Moorestown Court facility, consisting of 8 units, the Lenola School apartments, consisting of 33 units, the Old Firehouse facility, consisting of 8 units, and the Stokes Place building, consisting of 16 units. *Id.* at 244–50; Defendants' Exh. 3.G.1 to 3.G.2, 3.K.1 to 3.K.3, 3.I.1 to 3.I.3, 3.J.1 to 3.J.2, 3.H.1 to 3.H.2.

## II. Conclusions of Law

### A. Procedural Issues

Defendants have raised several procedural issues which, they contend, either prevent Plaintiffs from maintaining this action, or prevent the Court from exercising jurisdiction over, or rendering a decision in, this action. For the reasons set forth below, I conclude that these concerns are misguided and without merit.

#### i. Standing

1. There are three elements for constitutional standing: injury, causation, and redressability. *See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Planning Board claims that Plaintiffs do not have standing to sue because they do not satisfy the injury prong.[5] The Planning Board asserts, without any explanation, that the injuries to Plaintiffs are "conjectural." Planning Board's Proposed Findings of Fact and Conclusions of Law ¶ 17 at 10 (dated Jan. 12, 1998) (hereinafter Planning Board's

5. The Planning Board has not raised the issue of prudential standing, as distinct from constitutional standing. *See, e.g., Davis by Davis v. Philadelphia Housing Auth.,* 121 F.3d 92, 95–96 (3d Cir.1997); Erwin Chemerinksy, *Federal Jurisdiction* 57–58 (2d ed.1994). Indeed, they could not as "courts lack the authority to create prudential barriers to standing in suits brought under [the Fair Housing Act]." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *see also Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1497 (10th Cir.1995); H.R.Rep. No. 100–711, at 23 (1988) *reprinted in* 1988 U.S.C.C.A.N. 2173, 2184.

Proposed Findings).[6] Congress has provided a cause of action under 42 U.S.C. § 3613 to a particularly broad group of potential plaintiffs: "an aggrieved person," which is defined to include "any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person *will be injured* by a discriminatory housing practice that is *about to occur.*" 42 U.S.C. § 3602(i) (emphasis added). Preventing a developer from providing housing to the elderly and handicapped by denying the elderly and handicapped a reasonable accommodation and by resorting to discrimination against the development's future residents, is not a conjectural injury under the FHA. Nor is causing, as a direct and foreseeable result of the alleged discrimination, the developer to incur substantial additional expenses to provide such housing, *e.g.*, costs to search for alternative sites and costs to maintain an option to purchase land.[7] *See, e.g., Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1100 n.2 (3d Cir.1996) (noting that FHA has been interpreted to permit broad assertions of third-party standing); *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) (concluding that "where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that the municipality actually so apply it before the ordinance may properly be challenged"), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996); *Growth Horizons, Inc. v. Delaware County, Pennsylvania,* 983 F.2d 1277, 1281–82 & nn. 6–7 (3d Cir.1993); *Judy B. v. Borough of Tioga,* 889 F.Supp. 792, 797 (M.D.Pa.1995); *Kessler Inst. for Rehabilitation, Inc. v. Mayor & Council of the Borough of Essex Fells,* 876 F.Supp. 641, 651–52 (D.N.J.1995); *Horizon House Dev't Serv., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 692 (E.D.Pa. 1992), *aff'd mem.,* 995 F.2d 217 (3d Cir.1993). Accordingly, I conclude that ALA and LCM do have standing to maintain a cause of action under 42 U.S.C. § 3604, both on their own behalf and in the name of the Doe Plaintiffs.

**ii. Ripeness**

2. The Township argues that the controversy is not ripe. It contends that, because ALA never applied to the Zoning Board for a variance, it cannot be determined how the applicable zoning regulations, specifically, the ordinance which requires an assisted living facility to be within the Township's sewer service area and which prevents them from being even conditionally allowable in the R-1 district, will apply to ALA. *See, e.g.,* Letter from Peter R. Buchsbaum, Esq. 4 (dated Dec. 16, 1997).[8] Although not cited by the Township, some authority for this proposition may be found in *Acierno v. Mitchell,* 6

6. In addition to considering the more formal arguments which the parties included in their pre-hearing briefs or which were made during the two-day preliminary injunction hearing, I have also considered the proposed findings of fact and conclusions of law submitted by the parties several weeks after the hearing.

7. The Planning Board also made a standing argument in its original brief in opposition to Plaintiffs' motion for a preliminary injunction. *See* Planning Board's Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction 21 (undated). At that point, ALA's application for approval of the facility on the Wilson site was pending. Considering the fact that ALA could still have received an approval and therefore have avoided injury, the argument that the injury was conjectural was at least plausible. However, now that the Wilson site application has been withdrawn because of, *inter alia,* ALA's concerns over pollution, the contention is meritless. *See also* n. 8, *infra.*

8. The Township also argues that the controversy is not ripe because ALA withdrew its application for approval of its facility on the Wilson site and can reinstate that application at any time. *See* Township's Proposed Findings of Fact and Conclusions of Law ¶¶ 101–110 at 21 (dated Jan. 12, 1998); *see also* ¶¶ 60–63, *supra.* Arguments related to both standing and ripeness which are predicated on the withdrawal or potential resubmission of the Wilson application are beside the point. On numerous occasions, Parkinson testified that ALA applied for approval of the Wilson property only as a "fail-safe" option. For a number of quite plausible reasons which ALA cited upon withdrawal, Plaintiffs eventually decided that they did not want to construct a facility on the Wilson property. *See* ¶ 63, *supra.* Why the Court should not consider this case justiciable because Plaintiffs are no longer requesting something they do not presently want and for which they are not suing, but which they could theoretically request, is beyond me. Defendants' contentions regarding ripeness and standing based on ALA's Wilson site application are meritless.

F.3d 970 (3d Cir.1993) (discussing *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) and *Taylor Inv., Ltd. v. Upper Darby Township,* 983 F.2d 1285 (3d Cir.1993), *cert. denied,* 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993)).

The record in this case illustrates that Plaintiffs have made a substantially stronger showing than the plaintiffs in *Acierno, Taylor,* or *Williamson* on the two factors which must be considered by the Court in determining whether there is a ripe controversy: the "fitness of issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *see also* 15 James Wm. Moore & Martin H. Redish, *Moore's Federal Practice* § 101.76 (3d ed.1997) (noting that fitness prong of ripeness inquiry may involve finality of agency action, certainty of events, or development of factual record necessary for decision).

The common thread in *Acierno, Taylor,* and *Williamson* is that the plaintiffs in those cases could not conclusively know whether and/or to what extent they would be injured without a more final determination of the application and/or of the impact of zoning regulations. Particularly important to each decision was the notion that "local zoning authorities are flexible institutions ... that may give back with one hand what they have taken with the other," that is, that local zoning authorities should have the opportunity to mitigate or remedy a potential injury. *Taylor,* 983 F.2d at 1294; *see also Acierno,* 6 F.3d at 975; *Williamson,* 473 U.S. at 190 (noting that applicant never formally attempted to resolve its zoning problem).

In this case, however, there is no question as to what the result of an application for a variance from the sewer-related aspects of Ordinance No. 1806–97, *see* ¶ 31, *supra,* would be. The Township's own witness, McVey, one of the most knowledgeable and influential figures within the Township, if not the most, with respect to zoning and planning, testified that it is "extremely unlikely" that a variance would be granted and that he would not recommend such a variance. Considering the fact that the proposed facility would not be in a sanitary sewer service area, something that he testified would be inconsistent with the Township's plans, he agreed that such a request would be futile. *See* ¶ 40, *supra.* This testimony was unrebutted and unchallenged. It confirms that there is "no question about how the regulations at issue [would apply] to the particular land in question."[9] *Suitum v. Tahoe Reg'l Planning Agency,* — U.S. —, —, 117 S.Ct. 1659, 1667, 137 L.Ed.2d 980 (1997) (citing *Williamson,* 473 U.S. at 186).

The proposition that "litigants are not required to make futile gestures to establish ripeness," *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639, (3d Cir.1995), has been applied in numerous zoning and non-zoning cases to establish the necessary certainty and finality that the "fitness" prong of the *Abbott* test requires. *See, e.g., Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (noting that claim was not unripe under *Williamson* where submission of a development plan to applicable state authority "would have been pointless, as [the defendant] stipulated below that no building permit would have been issued ... application or no application"); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 & n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("where the inevitability of the operation of a statute against certain individuals is patent," particular future contingency was "irrelevant to the existence of a justiciable controversy"); *United States v. Village of Palatine, Illinois,* 37 F.3d 1230, 1234 (7th Cir.1994) (holding that, in order to have justiciable controversy,

9. That McVey is not a member of the Zoning Board or that his opinion is not binding on the Zoning Board, *see* Zoning Board's Proposed Statement of Facts and Conclusions of Law ¶ 8 n. 1 (dated Jan. 12, 1998), does not rebut the evidence that ALA's application for a zoning variance from the sewer requirements for institutions would be futile or suggest that a variance application would be any less futile than McVey admitted it would be.

plaintiff need not resort to procedures to remedy zoning decision where such resort is "manifestly futile" or "foredoomed"); *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354, 1362–63 (6th Cir.1992) (holding that finality means that "further administrative action by [the applicant] would not be productive.... [This test] can be met by ... evidence [other than exhaustion of remedies] and can be satisfied prior to compliance with all the requisite procedures"); *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498 (9th Cir.1990) (noting that futility does not completely exempt property owner from applying for approval of development in order to have ripe controversy, but only from submitting multiple applications where result is clear), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *Doe v. City of Butler, Pennsylvania,* 892 F.2d 315, 322 (3d Cir.1989) (holding that plaintiffs' challenge to zoning provisions was not unripe where certain zoning application had not been rejected, since application would have been futile); *Horizon House Dev't Serv.,* 804 F.Supp. at 692 ("housing provider is not required to wait until a governmental entity enforces its rules against it before bringing suit"); *Easter Seal Soc'y of New Jersey v. Township of N. Bergen,* 798 F.Supp. 228, 236 (D.N.J.1992) (finding that "any further efforts to work within the municipal administrative apparatus [by pursuing appeals] would be an exercise in futility"); *compare Oxford House–C v. City of St. Louis,* 77 F.3d 249 (8th Cir.) (finding that conclusion that application for variance would have been futile was clearly erroneous where evidence was that neighbors merely opposed variance and local board routinely granted variances despite neighbor opposition), *cert. denied,* —— U.S. ——, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996); *see also National Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 289 (6th Cir.1997) (noting that pre-enforcement review of statute or ordinance is allowed over ripeness challenge where enforcement is inevitable); *see generally* Michael K. Whitman, *The Ripeness Doctrine in the Land–Use Context: The Municipality's Ally and the Landowner's Nemesis,* 29 Urban Law. 13, 39–45 (1997) (discussing futility exception).[10]

As additional evidence in favor of finding ripeness under *Abbott,* I look to the type of injury alleged. Numerous courts have stressed that housing discrimination causes a uniquely immediate injury. Such discrimination, which under the FHA includes a refusal to make reasonable accommodations, makes these controversies ripe. *See, e.g., Bryant Woods Inn, Inc. v. Howard Cty., Maryland,* 124 F.3d 597, 601 (4th Cir.1997) (distinguishing FHA claims from Just Compensation–Fifth Amendment claims and holding that a "violation of the FHA occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings"); *Buckeye Community Hope Found. v. City of Cuyahoga Falls,* 970 F.Supp. 1289, 1309–10 (N.D.Ohio.1997) (where allegedly illegal act was felt in concrete way by developer and related entities, challenge was ripe); *Kessler Inst.,* 876 F.Supp. at 656–57 (noting that economic, associational, and stigmatic injuries created ripe controversy and that condemnation of property need not occur for claims to "crystallize"); *cf. Growth Horizons,* 983 F.2d at 1283 n.8 ("conduct short of foreclosing a housing opportunity may violate the [FHA]"). Therefore, because of the futility of a variance application and the type of injury alleged, I conclude that nothing about the controversy as it exists at the preliminary injunction stage, either the factual rec-

10. It should also be noted that the present case involves, in part, unlike *Acierno, Taylor,* and *Williamson,* a facial challenge to a township ordinance based on a statutory cause of action, rather than a constitutional challenge to the mode of applying a statute or ordinance. *See, e.g., Suitum,* —— U.S. at —— n. 10, 117 S.Ct. at 1666 n. 10 (noting that "facial challenges to regulation [as constituting, in an of itself, a taking] are generally ripe the moment the challenged regulation or ordinance is passed"); *Blanche Road Corp. v. Bensalem Township,* 57 F.3d 253, 257–57 (3d Cir.1995) (distinguishing *Acierno* and noting that plaintiffs claims were direct substantive due process challenge to defendants' actions and, as such, were "actionable ... even if the ultimate outcome of plaintiffs' permit applications were favorable"), *cert. denied,* 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); *Oxford House, Inc. v. City of Virginia Beach, Virginia,* 825 F.Supp. 1251, 1260 (E.D.Va.1993) (distinguishing between ripeness of facial and "as applied" challenges).

ord, agency decision, or the injuries caused by the allegedly discriminatory zoning ordinance and the deprivation of an allegedly reasonable accommodation, is remote or uncertain such that the controversy is not fit for judicial resolution.

On the second prong of the ripeness test, it is clear that ALA, LCM, and the Doe Plaintiffs will endure hardship if consideration of the issue were withheld on grounds that the controversy is not ripe. Indeed, sending Plaintiffs back to the Zoning Board in a futile search for a variance deserves the interests of all of the parties. First, the factual record in this case is well-developed such that a feckless variance application is remarkably unlikely to shed light on whether the accommodation requested is reasonable or necessary. Applying for such a variance will only delay resolution of this action and the provision of preliminary injunctive relief. Second, forcing ALA and LCM to continue to expend funds to maintain their option to purchase part of the Garwood–Westfield Roads site and preventing them from generating a profit imposes a substantial hardship on ALA and LCM. Third, where the New Jersey Department of Health has certified that there is a need for an assisted living facility in Burlington County, further delays in adjudicating the motion for a preliminary injunction disserve the interest of the Doe Plaintiffs and, indeed, as I point out later, *see* ¶ 22, *infra*, the public interest generally. This is because one currently operating nursing facility is discontinuing service and two other senior care facilities are at or near full capacity. *See* ¶ 83, *supra.*[11] Finally, Defendants have suggested no reason why rendering a decision, without requiring Plaintiffs to apply to the Zoning Board for a use variance, would work a hardship on them.

Accordingly, I conclude there is no doubt that the controversy over the propriety of the ordinance and the reasonableness of the accommodation requested is sufficiently concrete such that it is fit for judicial resolution and that withholding a judicial decision would work substantial hardship on Plaintiffs. Therefore, I hold that the controversy is ripe.[12]

### iii. *Res Judicata* and New Jersey's Entire Controversy Doctrine

Defendants have made various arguments regarding the nature of the state court action and its effect on this action.

11. In its original brief in opposition to Plaintiffs' motion for a preliminary injunction, the Township made an additional argument about ripeness. The Township argued in unfocused fashion that "Plaintiffs made but one effort to obtain approval for a single site of their choice [and] there are ten other *zones* in which the use sought is conditionally permitted." Township's Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction 22 (Nov. 21, 1997) (emphasis added) (hereinafter Township's Brief in Opposition). The Township then argued that the fact that the Township has approved the construction of another assisted living facility, *see* ¶ 16, *supra,* and the fact that an assisted living facility could, theoretically, be constructed in other zones within Moorestown, *inter alia,* made the controversy unripe. *See* Township's Brief in Opposition at 24. These assertions, to the extent they are true or meaningful, *but see* ¶¶ 41–43, 48, 60–63, *supra,* do nothing to rebut the existence of a very real controversy regarding the denial of a reasonable accommodation.

These assertions are merely the procedural flipside of the Township's two-pronged position on the merits of the FHA claim: the Township has made reasonable accommodations for *another* applicant and there can be no failure to provide a reasonable accommodation under the FHA where the Township provides a regulatory framework in which it is theoretically possible for ALA to construct its facility. The obligation to make reasonable accommodations under 42 U.S.C. § 3604(f)(3)(B) for Plaintiffs is not, on the facts before me, satisfied by making such accommodations for *another* applicant. At best the accommodation of Brandywine, *see* ¶ 16, *supra,* is evidence to show that there is no history of discrimination. Nor is the obligation to make reasonable accommodations satisfied in this case, as I explain below, by providing a zoning scheme in which it is merely possible to build an assisted living facility. *See* ¶¶ 11–19, *infra.*

12. No doubt as a result of the significant controversy regarding ripeness and abstention, which I discuss below, in land-use cases, particularly in takings cases, several pieces of legislation have been introduced in Congress to address these procedural issues. *See, e.g.,* Property Owners Access to Justice Act of 1997, S. 1204, 105th Cong. (1997); Private Property Rights Implementation Act of 1997, H.R. 1534, 105th Cong. (1997); *see generally* R. Randy Lee, *Getting Takings Into Federal Court,* N.J.L.J., Dec. 15, 1997, at 24. Neither bill has been passed by both the House and Senate.

3. Pursuant to 28 U.S.C. § 1738, a federal court must give a state court judgment the same effect the courts of the state which rendered the judgment would give such a judgment. Nothing about the FHA claim that was asserted in the state court action could be deemed *res judicata* by a New Jersey court because that claim was not litigated on the merits in the state court and was eventually dismissed without prejudice, and not for failure to comply with any rule or order. The dismissal of the state action would not be given *res judicata* effect under New Jersey law. *See Mortgagelinq v. Commonwealth Land Title Ins. Co.*, 142 N.J. 336, 346, 662 A.2d 536 (1995) (discussing New Jersey preclusion law); *see, e.g., Arena v. Borough of Jamesburg,* 309 N.J.Super. 106, 706 A.2d 790 (App.Div. 1998); *Car Spa, Inc. v. High Tech of S & C, Inc.*, 267 N.J.Super. 422, 424, 631 A.2d 992 (App.Div.1993), *certif. denied*, 135 N.J. 304, 639 A.2d 303 (1994).

4. The Planning Board was not named as a Defendant in the state court action. The Planning Board has now argued that New Jersey's entire controversy doctrine bars assertion of claims against the Planning Board in the federal action since the Planning Board could have been joined in the state court action, but was not. *See* Letter from Dennis P. Talty, Esq. 2 (dated Dec. 16, 1997) (hereinafter Talty Letter); *see also* Planning Board's Proposed Findings ¶ 20 at 10 (arguing that "the *claims* which are the subject of the federal court complaint were brought or could have been brought in the state court proceeding. Under the entire controversy doctrine the plaintiffs were obligated to bring all *claims* in one proceeding") (emphasis added).

In *Rycoline Products v. C & W Unlimited.*, 109 F.3d 883 (3d Cir.1997), the Third Circuit dealt with a similar issue. In that case, Rycoline, a chemical products manufacturer, sued a competitor and several former employees who had left Rycoline to join the competitor in state court. The original complaint alleged several state and common law causes of action. After some procedural wrangling, including the denial of Rycoline's motion to amend the complaint to add certain federal causes of action, but not others, and while the state court action was still pending, Rycoline filed a substantially similar action in federal court, expanding slightly the scope of its original claims and adding claims which the state court had prevented Rycoline from asserting in the amended complaint. Rycoline also asserted claims against a defendant whom it had not sued in state court. *Id.* at 884.

After a comprehensive examination of New Jersey's entire controversy jurisprudence, the Third Circuit held that the entire controversy doctrine, recognized and codified in N.J.R.Ct. 4:30A,[13] does not preclude the initiation of a second litigation before the first action has been concluded. *Id.* at 888–89 (discussing relation between *Mortgagelinq* and *Kaselaan & D'Angelo Assoc., Inc. v. Soffian,* 290 N.J.Super. 293, 675 A.2d 705 (App.Div.1996)); *see also Pittston Co. v. Sedgwick James of N.Y.*, 971 F.Supp. 915 (D.N.J.1997) (discussing impact of *Rycoline*); *Fioriglio v. City of Atlantic City,* 963 F.Supp. 415, 424 (D.N.J.1997) (discussing scope of *Rycoline* and declining to apply entire controversy doctrine to bar second federal suit where state law claims were dismissed as outside applicable statutes of limitations in first federal suit); *see generally Hulmes v. Honda Motor Co.*, 924 F.Supp. 673 (D.N.J.1996) (discussing history and evolution of entire controversy doctrine and noting effect of voluntary dismissal on its operation and application). Thus, applying the holding of *Rycoline,* this federal action filed by ALA, LCM, and the Doe Plaintiffs, is not barred by the then-pending state court action filed by ALA.

Furthermore, in addition to *Rycoline,* there are at least two other reasons, each sufficient by itself, as to why the entire controversy doctrine does not affect the litigation of the FHA and other claims in this

13. N.J.R.Ct. 4:30A provides:

Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:64–5 (foreclosure actions) and R. 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

Court. First, the absence of any *res judicata* effect of the state court litigation on the FHA claims militates against the application of the entire controversy doctrine. *See Hulmes,* 924 F.Supp. at 682–83 (discussing *Cafferata v. Peyser,* 251 N.J.Super. 256, 597 A.2d 1101 (App.Div.1991)); *Arena,* 706 A.2d at 792 ("the entire controversy doctrine does not affect a plaintiff's right to file a new action based on the same factual allegations as a prior action which has been dismissed without prejudice under [N.J.R.Ct.] 4:37–1(a)").[14] Second, the Planning Board has not suggested that it has suffered any disadvantage or unfairness as a result of its not being joined as a party to the state court action, an action which was not extensively litigated. *See, e,g., DiTrolio v. Antiles,* 142 N.J. 253, 273–74, 662 A.2d 494 (1995) (discussing role of fairness considerations in applying entire controversy doctrine).

Thus, I conclude that the federal action filed by ALA and LCM on behalf of themselves and the Doe Plaintiffs against the Township, the Planning Board, and the Zoning Board is not barred by operation of the entire controversy doctrine as a result of the state court action naming the Township and Zoning Board, which was pending when the federal action was initiated.

**iv. Abstention**

5. Among them, Defendants have raised numerous abstention doctrines in a kind of collective "we hope something sticks" strategy. For the reasons set forth below, I find that none of the abstention doctrines advanced by Defendants is applicable to this case. Accordingly, the Court will not abstain from deciding the motions for a preliminary injunction, for summary judgment, and to dismiss.

**a. Pullman Abstention**

6. Citing *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Township argues that an unsettled question of state property law, which may affect the ability of ALA to construct its facility, requires abstention. *Pullman* abstention, however, is not required whenever there is a mere uncertainty about state law which may be material to providing relief in a federal action; such a rule would extend *Pullman* abstention far beyond its current boundary. Rather, *Pullman* abstention may generally be required "when a federal court is presented with both a *federal constitutional issue* and an *unsettled issue of state law* whose resolution might narrow or eliminate the federal constitutional question, ... [thus] avoid[ing] 'needless friction with state policies.'" *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 631 (3d Cir. 1991) (quoting *Pullman,* 312 U.S. at 500), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). Accordingly, the following three special circumstances must be present for *Pullman* abstention to apply: "(1) uncertain issues of state law underlying the federal constitutional claim; (2) state law issues subject to state court interpretation that could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) an erroneous construction of state law by the federal court would disrupt important state policies." *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997); *see generally* Chemerinsky, *Federal Jurisdiction* at 687–88, 691–95. At this point in the litigation, the Township has not shown how interpretation of a simple land covenant relating to any potential "further subdivi[sion]", *see* ¶ 18, *supra,* could disrupt an important state policy. Nor at this point in the litigation need I abstain to avoid a federal constitutional ruling since none of the motions currently pending requires the determination of a federal constitutional issue. Furthermore, the question of whether Defendants discriminated against Plaintiffs by failing to provide a reasonable accommodation remains regard-

14. It appears Judge Bookbinder dismissed ALA's claims pursuant to R. 4:37–1(b). Nonetheless, there would appear to be no significant distinction between the preclusive effect of a voluntary dismissal without prejudice by stipulation of an action before the service of an answer or a motion for summary judgment, and the preclusive effect of a voluntary dismissal without prejudice by order of the court.

less of the nature of the "further subdivi[sion]" covenant; the interpretation of this covenant may only alter the nature of the accommodation eventually necessary to afford equal opportunities to use and enjoy a dwelling. *See* ¶ 18, *supra; cf., e.g., Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1337 (D.N.J.1991). Therefore, I conclude that *Pullman* abstention is not warranted at this point in the litigation.

**b. Colorado River Abstention**

7. The Planning Board invites the Court to abstain on the basis of *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). *See* Talty Letter at 2. *Colorado River* abstention may be applied in order to avoid duplicative litigation. However, the litigation in state court is over and this litigation is not in any sense "duplicative." *See* ¶¶ 68–69, *supra.* Therefore, I conclude that, at this point in the litigation and on the record before me, *Colorado River* abstention is not warranted.[15]

**c. Younger Abstention**

8. Finally, Defendants argue that the Court should abstain on the basis of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Relying substantially on *O'Neill v. Philadelphia,* 32 F.3d 785 (3d Cir. 1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995), Defendants contend that the state court action filed by ALA is still "pending" within the meaning of *O'Neill* and that the other criteria for *Younger* abstention—the implication of important state interests in the state proceeding and the opportunity to raise constitutional issues in the state proceeding—are present. By ignoring the evolution and true meaning of *Younger* abstention, Defendants have lost sight of the forest for the trees in their explication of *Younger* and *O'Neill.* The state court action, a remedial action begun by ALA, is not the kind of proceeding in favor of which the Court should abstain.

*Younger* began as a criminal case in which Harris was indicted in state court for distributing leaflets allegedly in violation of California's Criminal Syndicalism Act. Rather than assert as a defense in the state criminal prosecution that the statute was unconstitutional, Harris filed an action in federal district court against Younger, the district attorney of Los Angeles, asking the district court to enjoin Younger from prosecuting him. A three-judge district court enjoined Younger from prosecuting Harris and held that the statute was unconstitutionally vague. On direct appeal, the Supreme Court reversed and concluded that, except under special circumstances, federal courts cannot enjoin pending state criminal proceedings. *Younger,* 401 U.S. at 54–55. To state the Supreme Court's rationale very simply, "Our Federalism," *id.,* 401 U.S. at 44, cannot countenance an effort by a criminal defendant to circumvent state criminal law in federal court where a criminal defendant can adequately challenge the legality of the state criminal proceeding in state court, unless special circumstances, such as a patently and completely unconstitutional state law, a bad faith prosecution, or some other unusual situation, are present. *Id.* at 54–55.

*Younger* has steadily been extended to cover state civil and administrative proceedings. In cases where a governmental entity is a party to the litigation, such as this case, it is the state's interest in *enforcing* its law *against* a private party which has always been protected. For example, in *Huffman v. Pursue,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the Supreme Court held that a federal district court did not have the power to enjoin a state civil nuisance pro-

15. Not only is *Colorado River* abstention technically improper, but to allow this litigation to proceed in this Court will not, as a practical matter, offend any of the fundamental principles of federalism and comity which *Colorado River* safeguards. Judge Bookbinder understood that the dismissal without prejudice of ALA's FHA claim would allow the federal action to go forward and that it could be sent back to state court as a result of abstention. Noting the relationship between the federal and state action, he said, "I don't care where you have a case, just have it someplace. If you want to take it all to Federal Court take it all to Federal Court, if you want to leave it all here leave it all here, but I have a conceptual problem with doing it twice." *See* Rother 11/28/97 Certif., Exh. II at 5; *see also id.* at 16.

ceeding. Significantly, the Supreme Court noted that the state proceeding:

> in important respects is more akin to a criminal prosecution than most civil cases. The State is a party to the [state court] proceeding, and the proceeding is both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials. Thus, an offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding.

*Id.*, 420 U.S. at 604; *see also Trainor v. Hernandez,* 431 U.S. 434, 444, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (applying *Younger* to prohibit injunction of state civil fraud enforcement proceeding which could have been instituted as criminal action); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (upholding district court decision to abstain under *Younger* out of deference to attorney discipline proceeding overseen by state supreme court).

Thus, in determining whether *Younger* abstention is proper, where a governmental entity is party to the litigation, courts have consistently distinguished between "coercive" and "remedial" state proceedings. *Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. 619, 627 n. 2, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (distinguishing *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)); *see, e.g., O'Neill,* 32 F.3d at 791 (holding that "state proceedings remain 'pending' within the meaning of Younger abstention, in cases ... where a *coercive* administrative proceeding has been *initiated by the State* in a state forum, where adequate state-court judicial review of the administrative determination is available to the federal claimants, and where the claimants have chosen not to pursue their state-court judicial remedies, but instead sought to invalidate the State's judgment by filing a federal action") (emphasis added); *id.* at 792 n. 2 (Lewis, J., dissenting) (discussing whether state proceeding was coercive within meaning of *Dayton Christian Schools*); *Nevada Entertainment Indus., Inc. v. City of Henderson,* 8 F.3d 1348, 1350–52 (9th Cir. 1993) ("[T]he City Council initiated the administrative proceeding in this case to enforce municipal code provisions requiring license applicants to complete applications truthfully. Because the administrative proceeding was coercive and brought by the state to enforce its laws," *Younger* abstention was appropriate.); *Ivy Club v. Edwards,* 943 F.2d 270, 280 & n. 12 (3d Cir.1991) (noting that *Younger* abstention typically arises where "federal litigation is initiated as a defense to ongoing state proceedings"), *cert. denied,* 503 U.S. 914, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992); *Alleghany Corp. v. Haase,* 896 F.2d 1046, 1050, 1053 (7th Cir. 1990) ("*Younger*'s central meaning is that a federal district court may not, save in exceptional circumstances, enjoin, at the behest of a person who has actually or probably violated a state statute, a state court proceeding to enforce the statute against that person. His remedy is to interpose his federal claims as a defense in that action.... *Younger* is confined to cases in which the federal plaintiff had engaged in conduct actually or arguably in violation of state law, thereby exposing himself to an enforcement proceeding in state court which, once commenced must be allowed to continue uninterrupted to conclusion.") (citations omitted) (Posner, J.), *cert. granted & vacated as moot,* 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991); *University Club v. City of New York,* 842 F.2d 37, 41–42 (2d Cir.1988) (rejecting argument that enforcement proceeding which could result in civil fine was remedial); *Tinson v. Pennsylvania,* 1995 WL 581978, *4 (E.D.Pa. Oct.2, 1995) (rejecting abstention argument in section 1983 action where state court action was initiated by federal plaintiffs and was remedial); *Musko v. McClandless,* 1995 WL 262520, *4 (E.D.Pa. May 1, 1995) (eviction proceeding for violation of local zoning ordinances was coercive); *Independence Public Media of Phila. v. Pennsylvania Pub. Television Network Comm'n,* 813 F.Supp. 335, 342 (E.D.Pa. 1993) (holding that where state action was remedial and initiated by federal plaintiffs, *Younger* abstention was not appropriate); *see also Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195 (3d Cir. 1992) (noting relationship between claims asserted in federal and state action in typical situation where *Younger* abstention applies).

In this case, ALA alleged in the state court action that the interpretation of the minimum acreage requirement was contrary to law and stated a cause of action under the FHA. The action was entirely initiated by ALA, not by any of Defendants. This proceeding was clearly begun to remedy what ALA thought were erroneous or illegal actions with respect to its application, and was surely not a coercive, enforcement-type action instituted by the state. Plaintiffs are not attempting to use the federal forum as an end run around state enforcement efforts. Rather, Plaintiffs have chosen to assert their federally protected rights in federal court. Accordingly, I conclude that *Younger* abstention is not warranted.[16]

### v. Failure to Exhaust Administrative Remedies

9. The Planning Board claims that Plaintiffs have failed to exhaust administrative remedies. Planning Board's Proposed Findings ¶ 18 at 10. Presuming some distinction between these unspecified "administrative remedies" and the variance and state court proceedings which Defendants believe Plaintiffs should have pursued, *see* ¶¶ 2, 8, *supra,* I hold that an FHA plaintiff has no obligation to pursue administrative remedies with the Department of Housing and Urban Development. *See* 42 U.S.C. §§ 3613(a)(2) ("an aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610 of this title and without regard to the status of any such complaint"), 3610 (outlining administrative complaints which may be filed with Secretary of Housing and Urban Development); *see, e.g., Bryant Woods,* 124 F.3d at 601. Therefore, I conclude that Plaintiffs need not pursue administrative remedies with the Secretary of Housing and Urban Development in order to maintain this action.

## B. Preliminary Injunction Factors

Having discussed and rejected the various procedural hurdles Defendants have erected, I must now consider whether ALA, LCM, and the Doe Plaintiffs are entitled to a preliminary injunction.

10. In order to prevail on a motion for a preliminary injunction, the moving party must demonstrate both: (1) a likelihood of success on the merits; and (2) the probability of irreparable harm if relief is not granted. In addition to these showings by the moving party, the Court must also consider: (3) the effect of the grant of preliminary relief on the non-moving party; and (4) whether the public interest will be served by the preliminary injunctive relief. *See, e.g., Schulz v. United States Boxing Ass'n,* 105 F.3d 127, 131 n. 6 (3d Cir.1997); *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 90–91 (3d Cir. 1992); *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197 (3d Cir.1990). In order to show a likelihood of success on the merits, the law of this Circuit requires a moving party to demonstrate, not "a certainty of prevailing, but rather ... a reasonable probability of eventual success in the litigation." *Hill Int'l v. Nat'l R.R. Passenger Corp.,* 957 F.Supp. 548 (D.N.J.1996) (citation omitted); *see also Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975) ("[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie ... showing [of] a reasonable probability that it will prevail on the merits"). If all four factors favor the grant of preliminary relief, the injunction may be granted. *American Tel. & Tel. v. Winback and Conserve Prog., Inc.,* 42 F.3d 1421, 1427 & n. 8 (3d Cir.1994) (noting relationship between first and second factors, and third factor), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995).

### i. Likelihood of Success on the Merits

11. In 1988, Congress passed the Fair Housing Amendments Act, Pub .L. 100–430,

16. Because I conclude that *Younger* abstention is not warranted, I need not decide the issue of whether *Younger* abstention would bar LCM from proceeding in federal court where LCM was not a party to the state court litigation, but is associated with ALA. Nor do I need to reach the question of whether *Younger* would bar ALA and LCM from asserting rights on behalf of the Doe Plaintiffs in federal court where ALA was not asserting the rights of the Doe Plaintiffs in the state court action.

102 Stat. 1620, which made substantial amendments to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968. Of particular concern to Congress was discrimination against the handicapped and as such, 42 U.S.C. § 3604 was amended to make it unlawful:

> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,
>
> (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
>
> (C) any person associated with that person.

42 U.S.C. § 3604(f).

12. Congress intended that these subsections:

> apply to state or local land-use ... laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to ... regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of ... land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.
>
> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community.
>
> ...
>
> Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities. Such discrimination often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose. These and similar practices would be prohibited.

H.R.Rep. No. 100–711, at 25, 1988 U.S.C.C.A.N. at 2185.

13. There are three ways in which a plaintiff may prove a violation of section 3604(f)(2). A plaintiff may show disparate treatment, also termed intentional discrimination, disparate impact, or, pursuant to section 3604(f)(3), a refusal to make reasonable accommodations. *See, e.g., Gamble v. City of Escondido*, 104 F.3d 300, 304–07 (9th Cir. 1997) (reviewing three theories of discrimination); *Larkin v. State of Michigan Dep't of Social Serv.*, 89 F.3d 285, 289 (6th Cir.1996); *The ARC of New Jersey, Inc. v. New Jersey*, 950 F.Supp. 637, 643 (D.N.J.1996). I find that Plaintiffs have shown a likelihood of success on the merits of at least the third theory.

14. Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3).

15. While the reasonable accommodation inquiry is highly fact-intensive, making decisional law quite case-specific, there are some relatively clear outer limits to

the inquiry. The obligation to provide reasonable accommodations does not require an accommodation which would impose "undue financial and administrative burdens." *Southeastern Community College v. Davis,* 442 U.S. 397, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). While that obligation does not require a substantial or "fundamental alteration in the nature of a program," *id.*, 442 U.S. at 410, it may require a "reasonable" modification. *Alexander v. Choate,* 469 U.S. 287, 300 & n. 20, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (discussing *Davis* and notion that obligation to provide a "reasonable accommodation" does not impose an "affirmative-action obligation"); *see also Juvelis by Juvelis v. Snider,* 68 F.3d 648, 653 (3d Cir.1995) (recognizing that reasonable accommodations may require "some affirmative steps" on part of accommodator); *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 334–35 (2d Cir.1995) (noting that providing reasonable accommodations "can and often will involve some costs"); *United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1416–17 (9th Cir.1994) (holding that obligation to provide reasonable accommodation "may require landlords to assume reasonable financial burdens in accommodating handicapped residents"); *see generally Hovsons,* 89 F.3d at 1104–06.

16. The ultimate burden at trial of proving that a proposed accommodation is not reasonable or that Plaintiffs cannot be accommodated rests with Defendants. *Hovsons,* 89 F.3d at 1103. *But see Bryant Woods,* 124 F.3d at 603–04; *Elderhaven, Inc. v. City of Lubbock, Texas,* 98 F.3d 175, 178 (5th Cir.1996).

17. The Doe Plaintiffs, prospective residents of the assisted living facility to be constructed by ALA and LCM, are handicapped within the meaning of the FHA. They will have "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h); *see* ¶¶ 12–14, *supra* (discussing nature of future residents of ALA and LCM's facility); *see, e.g., Hovsons,* 89 F.3d at 1103 & n. 3; *Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1010 (3d Cir. 1995).

18. The accommodation requested, exemption from section 1 and section 2 of ordinance No. 1806–97, amending Moorestown Code §§ 180–8(D) and 180–91, is reasonable. This accommodation will exempt Plaintiffs from the requirements that the proposed assisted living facility be located within an existing sanitary sewer service area, as shown in the Township's approved Wastewater Management Plan and that the proposed assisted living facility connect to the Township's sanitary sewer system, and will allow Plaintiffs' proposed use to be conditionally allowable in the R–1 zone. The Township introduced evidence that the areas east of Westfield Road have generally been reserved for less intense uses, and accordingly, areas east of Westfield Road have not been and will not be provided with sewer service. *See* Trans. at 157, 258–59 (noting correlation between sewer service and intensity of development). It is equally clear, however, that, where it has been to the Township's benefit to do so, the Township has accommodated sewer service, more intense uses, and more dense developments east of Westfield Road, all of which are to some extent inconsistent with the Township's re-examined Master Plan, *see* Plaintiffs' Exh. 36 at 9. The Township permitted the development of the Moorestown Hunt and Laurel Creek residential developments, both east of Westfield Road, and took upon itself affirmative efforts to provide, or cause to be provided, sewer service to those developments in exchange for multi-million dollar contributions to a fund which the Township could use to satisfy completely unrelated legal obligations.

Furthermore, in terms of the less dense/more rural character of the land east of Westfield Road, the Township ordinance requires that institutions such as an assisted living facility be constructed on property of a minimum of five acres. ALA and LCM plan to construct their facility on a 16.29–acre plot of land, leaving approximately 11.2 acres wholly undeveloped.[17] This is consistent

17. Also, it should be noted that among those removed from the list of conditional uses in the

with the large-lot development east of Westfield Road. Thus, from these facts, it is clear that the construction of an assisted living facility on the Garwood–Westfield Roads site, and its connection to the Township's sewer system or, alternatively, the construction of an on-site septic system, will *not substantially* or fundamentally alter the nature of Moorestown's zoning scheme. *See, e.g., Judy B.,* 889 F.Supp. at 800 (accommodation requested would not do damage to character of surrounding community); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, (D.N.J.1992) (Gerry, C.J.) (same).

Additionally, while reasonable accommodations can result in the imposition of some costs on the accommodator, ALA and LCM have volunteered to assume the costs of constructing a septic system, or the costs of connecting to the Township's sewer system by extending a line approximately halfway across Westfield Road, *i.e.,* a 10–foot extension, thereby substantially minimizing any costs to the Township. *See* ¶ 77, *supra; see Oxford House–Evergreen,* 769 F.Supp. at 1344 (accommodation was reasonable where it "would not cause undue financial burden to the City"). Thus, it is manifest that no unreasonable monetary costs will be imposed upon the Township by the proposed accommodation.

On the subject of sewers, the Township presented no evidence that the assisted living facility proposed by Plaintiffs would presently, or in the future, unduly burden the Township's sewer system, in terms of capacity or otherwise. *See* Trans. at 79, 154–56. The Township did present evidence that there exist some regulatory hurdles in terms of amending the wastewater management plan. The Township, however, presented no meaningful reason why an amendment to the wastewater management plan to allow ALA and LCM to connect to the Township's sewer system could not be made. The only evidence presented of a potential obstacle to such an amendment is that the provision of sewer service to an assisted living facility would have to be justified to those landowners east of Westfield Road who have been denied sewer service and that the amendment would have to be justified in terms of treatment capacity. Neither of these obstacles demonstrates that the requested accommodation is unreasonable.

Finally, as an alternative to connecting to the Township's sewer system, reflecting Plaintiffs' willingness to be flexible in the type of accommodation requested, LCM and ALA have proposed constructing an on-site septic system which the Township admitted was technically feasible, although, for some unspecified reason, not preferable. In short, Plaintiffs have shown that the accommodation requested is reasonable and Defendants have made no showing that it was not.

19. The accommodation requested is necessary to afford the Doe Plaintiffs equal opportunity to use and enjoy housing for several reasons. As I noted earlier in this Opinion, I am quite troubled by the timing of the enactment of Ordinance No. 1806–97. Several weeks after ALA and LCM had acquired the minimum five acres necessary to satisfy the requirements the imposition of which made their first application unsuccessful and after submitting their second application for conditional use and site plan approval, the Township effectively pulled the rug out from under Plaintiffs by passing an ordinance which removed assisted living from among the uses conditionally allowable in the R–1 zone and imposed special sewering requirements on assisted living facilities. Unlike the 5–acre requirement, ALA and LCM could do nothing on their own to comply with Ordinance 1806–97.

While New Jersey does have a "time of decision" rule which allows new ordinances to be applied to pending applications, such a rule cannot be used as a pretext for impermissible discrimination. A sudden and dramatic change to an existing zoning ordinance in response to a particular land-use application in a hasty effort to conform local zoning law to so-called fundamental Township land-use policies bespeaks pretext. This is especially true where other, equally fundamental

R–1 zone by section 2 of Ordinance No. 1806–97, the majority were institutions which could be logically connected to the elderly or handicapped. Schools, lodges, kennels, and cemeteries remained in the R–1 zone.

local zoning ordinances, which have been unenforceable as a result of litigation, have not been amended for at least two years. *See* ¶ 38, *supra.*

Regardless of whether Plaintiffs can prove that the timing, content, and context of the ordinance are such that it is the result of intentional discrimination or that it disparately impacts Plaintiffs, and whether or not the ordinance is ultimately justifiable and not pretextual, at this point in the litigation, the ordinance is highly suspect and the strong possibility that it was motivated in part by a discriminatory purpose or has a disparate impact is one among several factors to be considered in analyzing whether the requested accommodation is necessary. *See, e.g., Smith & Lee Assoc., Inc. v. City of Taylor, Michigan,* 102 F.3d 781, 790–94, 799 (6th Cir.1996); *Larkin,* 89 F.3d at 290; *Oxford House–C v. City of St. Louis,* 77 F.3d 249, 252 (8th Cir.1996), *cert, denied,* — U.S. —, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996); *Kormoczy v. Secretary, U.S. Dep't of Housing & Urban Dev't,* 53 F.3d 821, 824 (7th Cir.1995); *Bangerter v. Orem City Corp.,* 46 F.3d at 1501; *The ARC,* 950 F.Supp. at 643; *Association for Advancement of the Mentally Handicapped, Inc. v. Elizabeth,* 876 F.Supp. 614, 620–25 (D.N.J.1994).

Not dissuaded by the suspect ordinance, which as a practical matter doomed their pending application, ALA and LCM have made substantial efforts to search for, evaluate, and negotiate for the purchase of other sites in Moorestown. These efforts have largely been unsuccessful. Some of the sites contemplated were rejected by Parkinson and his partners for reasonable business-related reasons. As to those sites which could potentially be developed, the minutes of Planning Board meetings compel the conclusion that only sites on the periphery of established neighborhoods, if any, would, as a general matter, be acceptable to the Planning Board. *See, e.g.,* Trans. at 362; Plaintiffs' Exh. 17. Furthermore, the minutes betray a hostility toward having too many facilities in Moorestown providing housing to the elderly and/or handicapped. The statements quoted above, *see, e.g.,* ¶¶ 44–45, 49–51, 53, 55, *supra,* were not isolated statements, did not relate solely or even primarily to economic concerns, and were not the views of a sole member of the Planning Board. *See, e.g., Smith & Lee,* 102 F.3d at 793–95; *Easter Seal Society of New Jersey,* 798 F.Supp. at 234 & n. 1.

The FHA is a declaration of congressional policy that the handicapped can no longer be relegated to the periphery or transitional zones within our communities and that the handicapped must be as free as anyone else to choose where to live. In light of this goal, the accommodation requested is necessary in part to overcome the hostility, obstruction, and delaying tactics which likely resulted in the passage of Ordinance No. 1806–97, tactics which various members of the Planning Board indicated would be deployed against Plaintiffs. Therefore, I conclude that the proposed accommodation is necessary to provide equal housing opportunities to the Doe Plaintiffs.

Defendants attempted to show that the requested accommodation was not necessary by proving that there are approximately 400 acres of land in the R–1A, R–2, and R–3 zones of the Township on which an assisted living facility theoretically could be constructed. In calculating these 400 acres, Defendants included land which was in a sewer service area, was in lots of five acres or more, and was vacant or used for farming. *See, e.g.,* Trans. at 172–74. Setting aside the fact that there was no evidence that any one of these sites was, or in the near future would be, for sale, *see, e.g.,* Trans. at 289 (discussing 90 of 400 acres), and despite the excruciating detail in which Defendants reviewed the magical 400 acres, Plaintiffs need not have attempted to secure approval for every possible site in Moorestown in order to show that a requested accommodation is necessary. Requiring an FHA plaintiff to make unreasonable efforts to secure housing opportunities in order to show that the accommodation is necessary would, as a practical matter, eviscerate the statutory obligation to provide a reasonable accommodation.[18]

18. Furthermore, it should be noted that, while these 400 acres were within the *proposed* sewer

On the record before me, I find that Plaintiffs made numerous, good faith, and indeed, extraordinary efforts to look for suitable sites other than the original Garwood–Westfield Roads site. In some instances, they engaged in good faith discussions for the purchase of these sites. In another, the Wilson site, they applied in good faith to the applicable public bodies when they thought that a particular site was feasible. In short, when it became clear that development of the Garwood–Westfield Roads site was not going to be allowed by Defendants, ALA and LCM *did* not simply drop everything and demand "carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary." *Thornton v. City of Allegan*, 863 F.Supp. 504, 510 (W.D.Mich. 1993) (city reasonably accommodated applicant by locating and rezoning mutually suitable site). Rather, ALA and LCM were perfectly willing to play by Moorestown's rules and to look for alternatives sites. They made more than a reasonable effort, including absorbing the economic costs associated with these efforts, to search for alternatives. Finding none, they are now certainly entitled to the proposed accommodation.[19]

Defendants also made much of the fact that several months after removing assisted living as a conditional use in the R–1 zone, *i.e.*, passing section 2 of Ordinance No. 1806–97, assisted living was added as a conditional use to several other zones, bringing to ten the number of zones in which an assisted living facility theoretically could be constructed. However, if any addition of assisted living as a use in other zones, *see* ¶¶ 32, 58, *supra*, was actually an attempt to provide a reasonable accommodation and not merely an afterthought; this effort falls far short of an FHA plaintiff's entitlement under section 3604(f)(3)(B). Even after these changes in zoning, as I have discussed, ALA and LCM still could not locate an appropriate site or one which the Planning Board would have approved. I conclude, then, that the proposed accommodation is reasonable and necessary to secure equal housing opportunities.[20]

**ii. Irreparable Harm to Plaintiffs Absent Injunction**

20. In some circuits, a showing by a plaintiff that there is a likelihood of success on a claim that there has been discrimination under the FHA is sufficient to create a presumption of irreparable harm. *See, e.g., Rogers v. Windmill Pointe Village Club Ass'n, Inc.*, 967 F.2d 525, 528–29 (11th Cir. 1992) (relying upon *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.) (Tuttle, J.), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984)). In this Circuit, however, some courts have declined to apply such a presumption in light of circuit precedent regarding the availability of "statutory injunctions." *See, e.g., Judy B.*, 889 F.Supp. at 800; *Oxford House, Inc. v. Cherry Hill*, 799 F.Supp. at 463.

However, the *Gresham* court could not have considered 42 U.S.C. § 3613(c), the passage of which post-dated *Gresham*, and the district courts applying *Gresham*, all of which post-date the passage of section 3613(c), do not appear to have explicitly considered this provision. Section 3613(c) provides

> In a civil action under subsection (a) of this section [providing a private right of action to an "aggrieved person"], if the court finds that a *discriminatory housing practice* has occurred or *is about to occur*, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section [relating to contracts, sales, and encumbrances], *may grant as relief, as the court deems appro-*

service area, much of the 400 acres was not particularly near the areas *currently* served by sewers. *See* Plaintiffs' Exh. 19, 20; Defendants' Exh. 4; Trans. at 290–92 (noting that some of 400 acres would require 400 or 1000 foot extension lines as opposed to Plaintiffs' proposed 10–foot extension).

19. I need not reach the issue of when during the course of these efforts the proposed accommodation became "necessary" because it certainly is now.

20. Plaintiffs' showing regarding the reasonable accommodation was so strong, and Defendants' showing so weak, that even if Plaintiffs had the burden to make this showing, *i.e.*, if *Hovsons* were overruled, I would still hold that Plaintiffs had shown a likelihood of success on the merits of their FHA claim.

*priate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate* ).

42 U.S.C. § 3613(c)(1) (emphasis added); *see, e.g., Bangerter,* 46 F.3d at 1498 n. 12; *Epicenter of Steubenville, Inc. v. City of Steubenville,* 924 F.Supp. 845, 852 (S.D.Ohio1996) (dispensing with traditional showing of irreparable harm on basis of statutory language); *Andrews v. Montevalle of Scotts Valley, Inc.,* 1995 WL 274305, *2 (N.D.Cal. May 9, 1995) ("where a federal statute provides for injunctive relief ... the requirements of an inadequate remedy at law and irreparable harm need not be shown," although court may consider other factors besides merits, including standard equitable considerations); *North Shore–Chicago Rehab. Inc. v. Village of Skokie,* 827 F.Supp. 497, 509 (N.D.Ill. 1993); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Fairfield,* 790 F.Supp. 1197, 1208 (D.Conn.1992); *Baxter v. City of Belleville,* 720 F.Supp. 720, 734 (S.D.Ill.1989) (finding that FHA plaintiff need not show irreparable harm and citing *Illinois Bell Tel. Co. v. Illinois Commerce Comm.,* 740 F.2d 566, 571 (7th Cir.1984)); *see generally Federal Trade Comm'n v. National Invention Serv., Inc.,* 1997 WL 718492 (D.N.J. Aug.11, 1997); *TKR Cable Co. v. Cable City Corp.,* 1996 WL 465508, *10 (D.N.J. July 29, 1996); *United States v. Richlyn Labs.,* Inc., 827 F.Supp. 1145, 1150 (E.D.Pa.1992) ("where ... an injunction is ... sought pursuant to a statutory provision, a different standard [from standard preliminary injunction] is ... applied"); 13 James Wm. Moore, Thomas E. Baker, Hon. Charles L. Brieant, Joseph T. McLaughlin, Martin H. Redish & Thomas D. Rowe, Jr., *Moore's Federal Practice* § 65.22[1][b] at 65–46 to –47 (3d ed.1997) (noting that preliminary injunctions may be granted without a showing of irreparable harm where preliminary injunction is authorized by statute).

This view of the law is not inconsistent with practice within the Third Circuit. For example, in *Government of the Virgin Islands v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir.1983), the Third Circuit noted that when a statute contains, either explicitly or implicitly, a finding that violations will harm the public, the courts may grant preliminary equitable relief on a showing of a statutory violation without requiring any additional showing of irreparable harm. *Id.* at 286. The Court specifically approved the approach of *United States Postal Serv. v. Beamish,* 466 F.2d 804 (3d Cir.1972), which held that a statutory provision authorizing preliminary injunctive relief upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm for purposes of a preliminary injunction issued under Rule 65. *See also Easter Seal Soc'y of New Jersey,* 798 F.Supp. at 235–36 (relying, in part, on presumption of irreparable harm). *But see Natural Res. Defense Council, Inc. v. Texaco Refining & Mktg.,* 906 F.2d 934, 940 n. 7 (3d Cir.1990) (questioning *in dicta* scope of holding of *Virgin Islands Paving*). *But see United States v. Barr Labs., Inc.,* 812 F.Supp. 458, 485 & n. 29 (D.N.J.1993) (noting that notwithstanding footnote in *Texaco Refining,* courts have continued to distinguish between statutory and general equity injunctions). Accordingly, given the very strong likelihood of success on the merits of the FHA claim, I conclude that a presumption of irreparable harm is warranted in this case.

**iii. Effect of Injunction on Defendants**

21. Defendants have suggested no reason why they would be harmed if they were enjoined from denying the proposed accommodation. The Township has argued that "Plaintiffs seek to by-pass Moorestown's zoning scheme and thereby preclude consideration of legitimate and crucial planning and development issues such as traffic regulation, population and development density and services to ensure the safety and comfort of all citizens." Township's Brief in Opposition 26. However, at most this appears to be speculation, couched as an argument, and a vague and weak one at that, that the proposed accommodation is not reasonable because it will require a substantial or fundamental alteration in the Township of Moorestown's communal character. As I have already

found, the proposed accommodation is reasonable. Other than their concerns about sewering and general development east of Westfield Road, Defendants did not suggest, and no evidence shows, that the proposed assisted living facility would be unreasonable as a result of traffic or safety problems. Furthermore, Plaintiffs will not be granted a blanket exemption from all zoning ordinances, but rather only from the requirements for which they need a reasonable accommodation.

In its proposed Conclusions of Law, the Township also gratuitously noted that the grant of a preliminary injunction would require the Township to "commit resources irretrievably to this matter while it is still pending." Township's Proposed Findings of Fact and Conclusions of Law ¶ 11 at 23. However, the Township adduced no evidence which supports the argument that the Township will suffer any economic damage if the injunction is granted. Accordingly, I find that the harm to Defendants, if any, is far outweighed by the harm to Plaintiffs.

**iv. Public Interest**

22. The Township has argued that the public interest generally is in line with its interests since, after all, it is a public entity. Township's Proposed Findings of Fact and Conclusions of Law ¶ 12 at 24. The adoption of such a proposition would almost always result in the denial of a preliminary injunction where the non-moving party is a public body. Quite to the contrary, in this case, the suspicious timing of the enactment of a potentially pretextual ordinance, the comments by members of the Planning Board which suggest an intent to marginalize the elderly and handicapped and to obstruct ALA and LCM's application, and the denial of a reasonable accommodation strongly suggest that the immediate eradication of discrimination and its effects is in the public interest. I conclude that the public interest weighs heavily in favor of the grant of the preliminary injunction.

**III. Scope of Injunction**

23. The reasonable accommodation necessary to afford Plaintiffs equal opportunity to use and enjoy dwelling, within the meaning of section 3602(b), is to exempt Plaintiffs from section 1 and section 2 of Ordinance No. 1806–97, amending Moorestown Code §§ 180–8(D) and 180–91. This relief will exempt Plaintiffs from the requirements that the proposed assisted living facility be located within an existing sanitary sewer service area, as shown in the Township's approved Wastewater Management Plan and that the proposed assisted living facility connect to the Township sanitary sewer system, and will allow Plaintiffs' proposed use to be conditionally allowable in the R–1 zone. This is the accommodation Plaintiffs proved was reasonable and necessary to afford them equal housing opportunities. Defendants could not show otherwise. With that relief, the Planning Board will be able to evaluate and administer Plaintiffs' plans to connect to the Township's sewer system or its plans to construct a septic system on Lots 1 and 2, and will still be able to apply all other applicable local zoning standards to ALA and LCM's application and eventual construction.

24. The proper parties to be enjoined are those parties who were, have been, or will be involved in the evaluation, passage, enforcement, and promulgation of the requirements that the proposed assisted living facility be located within an existing sanitary sewer service area, as shown in the Township's approved Wastewater Management Plan and that the proposed assisted living facility connect to the Township sanitary sewer system, and those parties involved in the application of the standards for determining conditional uses in the R–1 zone. The proper parties to be enjoined are the Township, the Zoning Board, and the Planning Board.

**IV. Defendants' Cross–Motions**

The Township cross-moved to dismiss the Verified Complaint based on abstention and ripeness grounds. I have already addressed the Township's arguments regarding abstention and ripeness and the motion to dismiss on that basis will be denied.

The Zoning Board cross-moved for summary judgment on a variety of grounds, in particular, the entire controversy doctrine and *Younger* abstention. For the reasons

set forth above, the motion for summary judgment will be denied.

Finally, the Planning Board cross-moved for summary judgment on two bases. The first relates to the role of the Planning Board in the alleged violations and in any injunction. I have already explained why it is appropriate to enjoin the Planning Board. The second basis relates to the availability of punitive damages. Such a basis is, without discovery and at this stage of the litigation, premature, and, accordingly, will be denied.

**V. Conclusion**

For the reasons set forth above, the motion for a preliminary injunction will be granted, and Defendants' cross motions will be denied. The Court will enter an appropriate order.

ORDER

This matter having come before the Court on the motion of Plaintiffs, Assisted Living Associates of Moorestown, L.L.C., Laurel Construction Management, Inc., and John and Jane Doe, for a preliminary injunction, Steven C. Rother, Esq. and A. Alberto Lugo, Esq. appearing, and the motion of Defendant, Moorestown Township, to dismiss the Verified Complaint, Robert S. Greenbaum, Esq., Peter A. Buchsbaum, Esq. and Robert S. Goldsmith, Esq. of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, L.L.P. appearing, and the motion for summary judgment of Defendant, Moorestown Township Zoning Board of Adjustment, Peter R. Thorndike, Esq. of Ryan and Thorndike appearing, and the motion for summary judgment of Defendant, Moorestown Township Planning Board, Dennis P. Talty, Esq. and Colin B. Scott, Esq. of Dennis P. Talty, P.C. appearing; and

The Court having considered the affidavits, certifications, briefs, letters, and exhibits submitted by the parties; and

The Court having conducted a hearing on December 11 and 17, 1997; and

For the reasons set forth in an OPINION filed concurrently with this ORDER;

IT IS HEREBY ORDERED on this 19th day of March, 1998, that Plaintiffs' motion for a preliminary injunction is GRANTED; and

IT IS FURTHER ORDERED that Defendants are ENJOINED from enforcing section 1 and section 2 of Ordinance No. 1806–97, amending Moorestown Code §§ 180–8(D) and 180–91, against Plaintiffs.

IT IS FURTHER ORDERED that Defendants' motions to dismiss the Verified Complaint and for summary judgment are DENIED.

OPINION DENYING REARGUMENT

Following this Court's grant of a preliminary injunction in this case on March 19, 1998, Defendants, Moorestown Township Zoning Board of Adjustment and Moorestown Township Planning Board, have each moved for reargument pursuant to Rule 7.1(g) of the Local Civil Rules for the District of New Jersey. Moorestown Township has joined in the motion filed by the Planning Board. For the reasons set forth below, the motions will be denied.

**I. Facts and Procedural History**

The facts underlying this action are set forth in great detail in this Court's opinion granting Plaintiffs' motion for a preliminary injunction, *Assisted Living Assoc. v. Moorestown Township,* 996 F.Supp. 409 (D.N.J. 1998), and will not be repeated here. The Court enjoined enforcement of certain sections of Moorestown Ordinance No. 1806–97 against Plaintiffs.

On April 2, 1998, ten days after I granted the injunction, *see* Fed.R.Civ.P. 6(a), Defendants, Moorestown Township Zoning Board of Adjustment (the "Zoning Board") and Moorestown Township Planning Board (the "Planning Board"), filed motions for reargument.[1]

1. Following the grant of the preliminary injunction, the law firm of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel ("Greenbaum, Rowe") orally informed the Court that it could no longer represent Defendant, Moorestown Township ("Moorestown" or the "Township"). As of the date of this opinion, new counsel has not substituted for Greenbaum, Rowe. Greenbaum, Rowe is, therefore, still counsel of record for the Township. Until the Township selects new counsel,

## II. Standard on Motion for Reargument

Motions for reargument are governed by Rule 7.1(g) of the Local Civil Rules for the District of New Jersey, formerly General Rule 12I. Rule 7.1(g) provides that a party may, "within ten days of the entry of an order or judgment," move for reargument. To support reargument, a moving party must show that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision. *See, e.g., Damiano v. Sony Music Entertainment, Inc.*, 975 F.Supp. 623, 633 (D.N.J.1996).

The word "overlooked" is the operative term in the Rule. *See* Allyn Z. Lite, *New Jersey Federal Practice Rules* 22 (1998 ed.). Mere disagreement with a decision of the district court should normally be raised through the appellate process and is inappropriate on a motion for reargument. *See Bermingham v. Sony Corp. of America, Inc.*, 820 F.Supp. 834, 859 n. 8 (D.N.J.1992), *aff'd mem.*, 37 F.3d 1485 (3d Cir.1994); *G–69 v. Degnan*, 748 F.Supp. 274, 275 (D.N.J.1990) ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.") (quotation omitted); *Florham Park Chevron, Inc. v. Chevron, U.S.A., Inc.*, 680 F.Supp. 159, 163 (D.N.J.1988). The Court will only entertain such a motion where the overlooked matters, if considered by the Court, might reasonably have resulted in a different conclusion. *See, e.g., Pittston Co. v. Sedgwick James of New York, Inc.*, 971 F.Supp. 915 (D.N.J.1997); *Panna v.. Firstrust Sav. Bank*, 760 F.Supp. 432, 435 (D.N.J.1991); *Pelham v. United States*, 661 F.Supp. 1063, 1065 (D.N.J.1987).

## III. Discussion

In support of its motions for reargument, the Planning Board has raised three factual or legal issues which, it contends, were overlooked by the Court. The Zoning Board raises an additional issue. I address them *seriatim*, and find all of the arguments advanced by the Planning and Zoning Boards to be without merit.

### A. Lynch Affidavit

The Planning Board argues that reargument is warranted because I overlooked the opinion of its expert, John J. Lynch. *See* Certification of John J. Lynch (dated Nov. 20, 1997), Exh. A (Planning Report (dated Nov. 1997)) (hereinafter Lynch Report). I did not overlook his report. I specifically considered the Lynch Report, and cited it in the Opinion. *See Assisted Living*, 996 F.Supp. at 415. I did not rely on it for any meaningful factual proposition because the Report was deserving of little weight.

First, the Lynch Report is articulated in the form of a legal conclusion which Lynch is simply not competent to make. Specifically, the intention of the Lynch Report is:

> to demonstrate that the Township of Moorestown has made *reasonable accommodations* for a variety of senior citizen and handicapped housing, including assisted living facilities; [and] that the Township *has not discriminated* against persons with handicaps or disabilities or those frail elderly in need of the specialized care which can be provided in assisted living facilities.

Lynch Report at 1 (emphasis added). Lynch also purports to give a legal opinion as to the operation of New Jersey's "time of decision" rule. *See* id. at 6; *see generally Assisted Living*, 996 F.Supp. at 417 (discussing nature of "time of decision" rule). Finally, Lynch expresses an opinion as to the legal enforceability of certain covenants and easements. *See* Lynch Report at 5. While Lynch may have vast experience as a professional planner, he is not competent to express a legal opinion as to these specifically legal questions. Accordingly, I accorded the Lynch Report little weight.

the Township is being represented by its Solicitor, Jeremy D. Countess, Esq. Although the Township did not file a formal motion for reargument or a brief, by letter the Township joined in the Planning Board's motion for reargument. *See* Letter from Jeremy D. Countess Esq. (dated Apr. 2, 1998).

Even if Lynch were competent to give the opinions he set forth in his Report, Local Rule 7.2(a) expressly prohibits the inclusion of legal argument in affidavits. It provides:

> Affidavits shall be restricted to statements of fact within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits. Legal arguments and summations in affidavits will be disregarded by the Court and may subject the affiant to appropriate censure, sanctions or both.

Local Civ. R. 7.2(a). Accordingly, because Lynch's certification violates Local Rule 7.2(a), I disregarded the legal arguments contained in the Lynch Report.

Moreover, I found the Lynch Report to be self-serving. It did not address, among other issues, the question of what principled distinction could be drawn between allowing intense uses and sewer service east of Westfield Road for the Laurel Creek and Moorestown Hunt developments, and denying Assisted Living the right to construct its facility on the Garwood–Westfield Roads site. *See, e.g., Assisted Living,* 996 F.Supp. 423, 434.

Finally, I concluded that the Lynch Report was deserving of little weight because it based its conclusion that Moorestown has acted responsibly towards Plaintiffs by pointing, in part, to accommodations the Township made for other parties, not joined in this litigation. *See* Lynch Report at 1 (asserting that "Moorestown has made reasonable accommodations for a variety of senior housing and handicapped housing, including assisted living facilities" and that the "Township has made additional reasonable accommodations for the handicapped and frail elderly [sic] by appropriately granting use variances in certain locations"). That argument has already been rejected by this Court. The Township cannot satisfy its obligations to Plaintiffs by accommodating someone other than Plaintiffs. *See Assisted Living,* 996 F.Supp. at 428 n.11. For these reasons, *inter alia,* I gave little, if any, credence to the Lynch Report. While I did not set out in my previous Opinion the reasons why I found the Lynch Report to be of little probative value, I certainly did not overlook it. Accordingly, the motion for reargument will be denied as to the Lynch Report.

### B. Role of the Planning Board

The Planning Board argues that statements made by members of the Planning Board cannot be used as evidence of "hostility inherent" in Ordinance No. 1806–97 because the Planning Board does not pass legislation. *See* Brief in Support of Defendant Moorestown Planning Board's Motion for Reargument 5 (dated Apr. 2, 1998). Essentially, the Planning Board argues that the Court overlooked the role of the Planning Board in passing ordinances. This assertion is misguided. Nothing about the role of the Planning Board was overlooked, and the motion for reargument on this basis will be denied.

At the outset, it should be noted that "the strong possibility that Ordinance No. 1806–97 was motivated in part by a discriminatory purpose ... is *one among several factors*" useful in determining whether the requested accommodation is necessary within the meaning of 42 U.S.C. § 3604(f)(3). *Assisted Living,* 996 F.Supp. at 437 (emphasis added). There were a number of additional factors present in this case which, by themselves and apart from the role of the Planning Board in passing ordinances, made the requested accommodation necessary. For example, I held that the accommodation requested was necessary, in part, to overcome "delaying tactics ... which various members of the Planning Board indicated would be deployed against Plaintiffs." *Id.* at 437. The employment of such tactics is independent of the Planning Board's role in passing ordinances.

I also found that the accommodation requested was necessary because the Planning Board minutes reflected an intention to relegate Plaintiffs to the peripheral areas of the Township in doling out approvals. *Id.* at 437. Finally, the accommodation requested was necessary because of Plaintiffs' inability to locate other suitable sites in Moorestown despite substantial efforts to do so. *See id.* at 437–38. Thus, even if I overlooked the Planning Board's role in passing ordinances—

which, as I explain shortly, I did not—this would not be dispositive.

More fundamentally, the role of the Planning Board in passing ordinances was not overlooked at all. As I pointed out in my earlier decision, the Planning Board does play a role in the passage of amendments to local zoning ordinances. *See, e.g., Assisted Living,* 996 F.Supp. at 417 (noting role of planning boards in passage of ordinances). In addition, no evidence was presented to show that the Township's motivation in enacting the Ordinance was any different than the Planning Board's. *See, e.g.,* Certification of John T. Terry (dated Nov. 18, 1997), Exh. A (hereinafter Terry Certif.). Finally, it must be noted that the member of the Planning Board who showed perhaps the most hostility towards Plaintiffs, Salvatore Alessi, *see Assisted Living,* 996 F.Supp. at 419–20, is also a member of the Township Council which passed Ordinance No. 1806–97 and the Township Council's representative on the Planning Board. *See, e.g.,* Terry Certif., Exh. A; Transcript at 344 (dated Dec. 11 & 17, 1997) (hereinafter Trans.). In short, the role of the Planning Board in passing Ordinance No 1806–97 as reflected in my earlier Opinion is entirely accurate. *See, e.g., id.* at 436–37. Nothing was overlooked in this regard. Therefore, the motion for reargument on this basis will be denied.

### C. Relevance and Immunity

The Planning Board argues that minutes of the Planning Board meetings, Plaintiffs' Exh. 16–17, should not have been considered because of "legislative or quasi-judicial immunity." Brief in Support of Defendant Moorestown Planning Board's Motion for Reargument 6. This argument is so unfocused that it is difficult to discern exactly what assertion is being advanced. Under the most reasonable reading of the Planning Board's argument, however, it is entirely without merit.

At the outset, the Planning Board notes that its co-Defendant, the Township, objected to the Court's consideration of the minutes of the Planning Board meetings. The Planning Board, however, rightly characterizes the Township's objection to the introduction and/or consideration of the minutes as "implicit[ ]." *See id.* I say "rightly" because it is at best unclear whether there was such an objection either at that time, or ever. *See, e.g.,* Trans. at 347. I allowed the question to which counsel for the Township objected because the minutes of the Planning Board meetings were already in evidence. *Id.* When Plaintiffs' counsel had originally introduced the minutes in evidence, there was no objection by Defendants' counsel. *See* Trans. at 36–38. Thus, any objection to their introduction was, at best, "implicit," if not waived.

The essence of the Planning Board's argument appears to be that the minutes of two Planning Board meetings, Plaintiffs' Exh. 16–17, should not have been "considered ... under the theories of legislative or quasi-judicial immunity." Brief in Support of Defendant Moorestown Planning Board's Motion for Reargument 6. Unfortunately, the Planning Board has confused the imposition of liability with the consideration of the statements at the meeting as evidence of legislative intent. First, I did not impose liability on the individual members of the Planning Board based on what they said at the meetings. Indeed, they are not even named as Defendants in this action. Additionally, legislative and quasi-judicial immunity protects only *individual members* of a legislative or quasi-judicial body, not the body itself. *See, e.g., Orange Lake Assoc., Inc. v. Kirkpatrick,* 21 F.3d 1214, 1223–24 (2d Cir.1994) (individual members of town board, in absence of planning board, were entitled to legislative immunity in adoption of master zoning plan pursuant to New York law); *Bass v. Attardi,* 868 F.2d 45 (3d Cir. 1989) (holding that section 1983 suit should not have been dismissed against Planning Board members in official capacities because "suit naming Planning Board members in official capacities in effect makes the Planning Board a defendant" and "Planning Board as a governmental entity has no immunity whatsoever"); *Affrunti v. Zwirn,* 892 F.Supp. 451 (E.D.N.Y.1995) (holding that individually-named members of town board

were entitled to legislative immunity), *aff'd mem,* 100 F.3d 943, 1996 WL 53625 (2d Cir. Feb.8, 1996); *Jodeco, Inc. v. Hann,* 674 F.Supp. 488, 497–99 (D.N.J.1987) (finding that planning and zoning boards in New Jersey are quasi-judicial bodies, but were not entitled to any form of immunity from civil damages in section 1983 suit); *Meding v. Hurd,* 607 F.Supp. 1088, 1110 (D.Del.1985); *see generally Bogan v. Scott–Harris,* — U.S. —, 118 S.Ct. 966, — L.Ed.2d — (1998) (extending legislative immunity to local officials performing legislative functions). Thus, legislative or quasi-judicial immunity is simply not a relevant consideration at this point in this case.[2]

In my prior Opinion, I simply considered statements made at the Planning Board meetings as, *inter alia,* evidence of the motivation behind the enactment of Ordinance No. 1806–97 and of the treatment of Plaintiffs. The Supreme Court has held that such minutes are precisely the kind of evidence which should be considered when determining whether a statute has been motivated by an impermissible purpose. The Court has noted that "the legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the [decision-making] body, minutes of its meetings, or reports." *Village of Arlington Heights v. Metropolitan Housing Dev't Corp.,* 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also id.* at 267 & n.16 (noting hypothetical situation where entity departed from established procedure in effecting zoning change exemplified by situation where "property involved had been zoned [a certain way] but suddenly was changed ... when the town learned of [party's] plans to erect integrated housing"). As such, consideration of the minutes of the meetings of municipal bodies as evidence is unremarkable. *See, e.g., City of Memphis v. Greene,* 451 U.S. 100, 142–43, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (discussing "*Arlington Heights*-type evidence"); *Phillips v. Borough of Keyport,* 107 F.3d 164, 168–70, 178 (3d Cir.) (noting testimony before board of adjustment and role of planning board's recommendation in amending zoning ordinance, considering minutes of town council meeting, and noting "the requirement that there be a factual basis for a legislative judgment presented in court when that judgment is challenged"), *cert. denied,* — U.S. —, 118 S.Ct. 336, 139 L.Ed.2d 261 (1997); *Lakeland Lounge v. City of Jackson, Mississippi,* 973 F.2d 1255, 1258–59 (5th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993); *id.* at 162 n. 12 (Politz, C.J., dissenting); *People Who Care v. Rockford Bd. of Ed., School Dist. #205,* 851 F.Supp. 905, 931–32 (N.D.Ill.1994), *aff'd in part and rev'd in part on other grounds,* 111 F.3d 528 (7th Cir.1993); *United States v. Yonkers Board of Educ.,* 624 F.Supp. 1276, 1303 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* 486 U.S. 1055 (1988). Because no liability has been imposed on the individual members of the Planning Board and the minutes of a meeting of a municipal body may properly be considered as evidence, the consideration of the meetings of the Planning Board was not improper, and nothing was overlooked in this regard. Therefore, the motion for reargument on these grounds will be denied.[3]

### D. Role of the Zoning Board

The Zoning Board asserts that I overlooked the fact that Plaintiffs were effectively waiving a challenge to the Zoning Board's interpretation of Moorestown's minimum acreage requirement. This was something which, *inter alia,* I explicitly said during the preliminary injunction hearing.

2. The Planning Board hedges its bets by asserting both legislative and quasi-judicial immunity. If legislative immunity were an issue in this case at this point, it is not clear that the Planning Board's actions with respect to Plaintiffs were legislative. *See, e.g., Carver v. Foerster,* 102 F.3d 96, 100 (3d Cir.1996) (discussing test to determine whether public official is entitled to legislative immunity); *see also Jodeco,* 674 F.Supp. at 497–99.

3. Since Plaintiffs have not attempted to impose liability on the individual members of the Planning or Zoning Boards, I need not reach the question of whether these defenses have been properly asserted by Defendants in their Answers. Similarly, I need not decide at this time the question of whether the Planning Board was acting in a legislative or quasi-judicial capacity during the Planning Board meetings at issue.

Accordingly, it was not overlooked and the Zoning Board's motion will be denied.

In the state court prerogative writs action, Plaintiffs had challenged the Zoning Board's interpretation of the 5-acre minimum acreage requirement, specifically whether certain deed-restricted lands could be used to satisfy that requirement. *See, e.g., Assisted Living,* 996 F.Supp. at 417 (noting basis of prerogative writs action). During the preliminary injunction hearing, Plaintiffs stated that they no longer needed to use the 11.2-acre parcel of land which was encumbered by the conservation easement to satisfy the minimum acreage requirement, effectively making moot the challenge to the Zoning Board's interpretation of the minimum acreage requirement. Indeed, there was a relatively lengthy colloquy on this point. *See* Trans. at 415–18. Reflecting this in my written Opinion, I noted that Plaintiffs had purchased additional land while their initial application was pending and, accordingly, intended to use the 3.55 acres of Lot 1 and 2.05 acres of Lot 2 to meet the minimum acreage requirement. I also noted that Plaintiffs did not propose, *inter alia,* to use the 11.2 acres encumbered by the equestrian and agricultural easement. *See Assisted Living,* 996 F.Supp. at 417. Thus, it is abundantly clear that I did not overlook the fact that the Zoning Board's interpretation of the minimum acreage requirement was no longer at issue in this action. Not only did I say so at the preliminary injunction hearing, I explained in my Opinion why Plaintiffs were no longer challenging the Zoning Board's interpretation of the minimum acreage requirement. *Id.* Nothing regarding the Zoning Board's role in this action was overlooked by this Court. Therefore, the motion for reargument on this basis will be denied.

Moreover, the Zoning Board apparently misunderstands why I held that it was properly included within the scope of the injunctive relief granted in this case. I held that the "proper parties to be enjoined are those parties who were, have been, or will be involved in the evaluation, passage, enforcement, and promulgation of the requirements that the proposed assisted living facility be located within an existing sanitary sewer service area, as shown in the Township's approved Wastewater Management Plan and that the proposed assisted living facility connect to the Township sanitary sewer system, and those parties involved in the application of the standards for determining conditional uses in the R-1 zone," *id.* at 440. I further held that those parties are the Township, the Zoning Board, and the Planning Board. *Id.* This was unquestionably within the Court's broad equitable powers under Rule 65(d), which provides that an injunction may bind "the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order." Fed.R.Civ.P. 65(d). Rule 65(d) applies fully to governmental entities. *See, e.g., Thompson v. Freeman,* 648 F.2d 1144, 1147–48 (8th Cir.1991) (finding that injunction should not have included Department of Health and Human Services since it was not in active concert with Missouri Department of Social Services); *see also Stolberg v. Members of Bd. of Trustees for State Colleges of State of Conn.,* 541 F.2d 890, 898 (2d Cir.1976), *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1976); *cf. Spallone v. United States,* 493 U.S. 265, 276–77, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). The Zoning Board has advanced no reason why it does not fall within the class of entities who may be enjoined. The Zoning Board was a proper party to the injunction, and therefore the Zoning Board's motion for reargument must be denied.

## IV. Conclusion

For the reasons set forth above, the motions for reargument of the Planning Board, joined by the Township, and of the Zoning Board will be denied. The Court will enter an appropriate order.

### ORDER

This matter having come before the Court on the motions for reargument filed by Defendants, Moorestown Township Planning Board, Dennis P. Talty, Esq. and Colin B. Scott, Esq., Dennis P. Talty, P.C. appearing, and Moorestown Township Zoning Board of

Adjustment, Peter R. Thorndike, Esq., Ryan and Thorndike appearing, Jeremy D. Countess, Esq., and Robert S. Greenbaum, Esq., Peter A. Buchsbaum, Esq., and Robert S. Goldsmith, Esq. Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, L.L.P., appearing on behalf of Defendant, Moorestown Township, and joining in the motion made by Defendant, Moorestown Township Planning Board, and Steven C. Rother, Esq. and A. Alberto Lugo, Esq. appearing on behalf of Plaintiffs, Assisted Living Associates of Moorestown, L.L.C., Laurel Construction Management, Inc., and John and Jane Doe; and

The Court having considered the submissions of the parties; and,

For the reasons set forth in an OPINION filed concurrently with this ORDER,

IT IS HEREBY ORDERED on this 9th day of April, 1998, that the motions for reargument are DENIED.